[L.A. No. 30520. Dec. 27, 1976.]

MICHELLE MARVIN, Plaintiff and Appellant, v.
LEE MARVIN, Defendant and Respondent.

**COUNSEL**

Marvin M. Mitchelson, Donald N. Woldman, Robert M. Ross, Fleish-man, McDaniel, Brown & Weston and David M. Brown for Plaintiff and Appellant.

Jettie Pierce Selvig, Ruth Miller and Suzie S. Thorn as Amici Curiae on behalf of Plaintiff and Appellant.

Goldman & Kagon, Mark A. Goldman and William R. Bishin for Defendant and Respondent.

Herma Hill Kay, John Sutter, Doris Brin Walker and Treuhaft, Walker, Nawi & Hendon as Amici Curiae on behalf of Defendant and Respondent.

Isabella H. Grant and Livingston, Grant, Stone & Shenk as Amici Curiae.

## OPINION

**TOBRINER, J.**—During the past 15 years, there has been a substantial increase in the number of couples living together without marrying.[1] Such nonmarital relationships lead to legal controversy when one partner dies or the couple separates. Courts of Appeal, faced with the task of determining property rights in such cases, have arrived at conflicting positions: two cases (*In re Marriage of Cary* (1973) 34 Cal.App.3d 345 [109 Cal.Rptr. 862]; *Estate of Atherley* (1975) 44 Cal.App.3d 758 [119 Cal.Rptr. 41]) have held that the Family Law Act (Civ. Code, § 4000 et seq.) requires division of the property according to community property principles, and one decision (*Beckman* v. *Mayhew* (1975) 49 Cal.App.3d 529 [122 Cal.Rptr. 604]) has rejected that holding. We take this opportunity to resolve that controversy and to declare the principles which should govern distribution of property acquired in a nonmarital relationship.

We conclude: (1) The provisions of the Family Law Act do not govern the distribution of property acquired during a nonmarital relationship; such a relationship remains subject solely to judicial decision. (2) The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. (3) In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case.

In the instant case plaintiff and defendant lived together for seven years without marrying; all property acquired during this period was taken in defendant's name. When plaintiff sued to enforce a contract under which she was entitled to half the property and to support payments, the trial court granted judgment on the pleadings for defendant, thus leaving him with all property accumulated by the couple during their relationship. Since the trial court denied plaintiff a trial on the merits of her claim, its decision conflicts with the principles stated above, and must be reversed.

---

[1]"The 1970 census figures indicate that today perhaps eight times as many couples are living together without being married as cohabited ten years ago." (Comment, *In re Cary: A Judicial Recognition of Illicit Cohabitation* (1974) 25 Hastings L.J. 1226.)

## 1. *The factual setting of this appeal.*

Since the trial court rendered judgment for defendant on the pleadings, we must accept the allegations of plaintiff's complaint as true, determining whether such allegations state, or can be amended to state, a cause of action. (See *Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 714-715, fn. 3 [117 Cal.Rptr. 241, 527 P.2d 865]; 4 Witkin, Cal. Procedure (2d ed. 1971) pp. 2817-2818.) We turn therefore to the specific allegations of the complaint.

Plaintiff avers that in October of 1964 she and defendant "entered into an oral agreement" that while "the parties lived together they would combine their efforts and earnings and would share equally any and all property accumulated as a result of their efforts whether individual or combined." Furthermore, they agreed to "hold themselves out to the general public as husband and wife" and that "plaintiff would further render her services as a companion, homemaker, housekeeper and cook to ... defendant."

Shortly thereafter plaintiff agreed to "give up her lucrative career as an entertainer [and] singer" in order to "devote her full time to defendant ... as a companion, homemaker, housekeeper and cook;" in return defendant agreed to "provide for all of plaintiff's financial support and needs for the rest of her life."

Plaintiff alleges that she lived with defendant from October of 1964 through May of 1970 and fulfilled her obligations under the agreement. During this period the parties as a result of their efforts and earnings acquired in defendant's name substantial real and personal property, including motion picture rights worth over $1 million. In May of 1970, however, defendant compelled plaintiff to leave his household. He continued to support plaintiff until November of 1971, but thereafter refused to provide further support.

On the basis of these allegations plaintiff asserts two causes of action. The first, for declaratory relief, asks the court to determine her contract and property rights; the second seeks to impose a constructive trust upon one half of the property acquired during the course of the relationship.

Defendant demurred unsuccessfully, and then answered the complaint. Following extensive discovery and pretrial

proceedings, the case came to trial.[2] Defendant renewed his attack on the complaint by a motion to dismiss. Since the parties had stipulated that defendant's marriage to Betty Marvin did not terminate until the filing of a final decree of divorce in January 1967, the trial court treated defendant's motion as one for judgment on the pleadings augmented by the stipulation.

After hearing argument the court granted defendant's motion and entered judgment for defendant. Plaintiff moved to set aside the judgment and asked leave to amend her complaint to allege that she and defendant reaffirmed their agreement after defendant's divorce was final. The trial court denied plaintiff's motion, and she appealed from the judgment.

2. ▓▓▓ *Plaintiff's complaint states a cause of action for breach of an express contract.*

In *Trutalli* v. *Meraviglia* (1932) 215 Cal. 698 [12 P.2d 430] we established the principle that nonmarital partners may lawfully contract concerning the ownership of property acquired during the relationship. We reaffirmed this principle in *Vallera* v. *Vallera* (1943) 21 Cal.2d 681, 685 [134 P.2d 761], stating that "If a man and woman [who are not married] live together as husband and wife under an agreement to pool

---

[2]When the case was called for trial, plaintiff asked leave to file an amended complaint. The proposed complaint added two causes of action for breach of contract against Santa Ana Records, a corporation not a party to the action, asserting that Santa Ana was an alter ego of defendant. The court denied leave to amend, and plaintiff claims that the ruling was an abuse of discretion. We disagree; plaintiff's argument was properly rejected by the Court of Appeal in the portion of its opinion quoted below.

No error was committed in denial of plaintiff's motion, made on the opening day set for trial, seeking leave to file a proposed amended complaint which would have added two counts and a new defendant to the action. As stated by plaintiff's counsel at the hearing, "[T]here is no question about it that we seek to amend the Complaint not on the eve of trial but on the day of trial."

In *Hayutin* v. *Weintraub*, 207 Cal.App.2d 497 [24 Cal.Rptr. 761], the court said at pages 508-509 in respect to such a motion that had it been granted, it "would have required a long continuance for the purpose of canvassing wholly new factual issues, a redoing of the elaborate discovery procedures previously had, all of which would have imposed upon defendant and his witnesses substantial inconvenience . . . and upon defendant needless and substantial additional expense. . . . The court did not err in denying leave to file the proposed amended complaint." (See also: *Nelson* v. *Specialty Records, Inc.,* 11 Cal.App.3d 126, 138-139 [89 Cal.Rptr. 540]; *Moss Estate Co.* v. *Adler,* 41 Cal.2d 581, 585 [261 P.2d 732]; *Vogel* v. *Thrifty Drug Co.,* 43 Cal.2d 184, 188 [272 P.2d 1].) "The ruling of the trial judge will not be disturbed upon appeal absent a showing by appellant of a clear abuse of discretion. [Citations.]" (*Nelson* v. *Specialty Records, Inc., supra,* 11 Cal.App.3d at p. 139.) No such showing here appears.

their earnings and share equally in their joint accumulations, equity will protect the interests of each in such property."

In the case before us plaintiff, basing her cause of action in contract upon these precedents, maintains that the trial court erred in denying her a trial on the merits of her contention. Although that court did not specify the ground for its conclusion that plaintiff's contractual allegations stated no cause of action,[3] defendant offers some four theories to sustain the ruling; we proceed to examine them.

Defendant first and principally relies on the contention that the alleged contract is so closely related to the supposed "immoral" character of the relationship between plaintiff and himself that the enforcement of the contract would violate public policy.[4] He points to cases asserting that a contract between nonmarital partners is unenforceable if it is "involved in" an illicit relationship (see *Shaw* v. *Shaw* (1964) 227 Cal.App.2d 159, 164 [38 Cal.Rptr. 520] (dictum); *Garcia* v. *Venegas* (1951) 106 Cal.App.2d 364, 368 [235 P.2d 89] (dictum), or made in "contemplation" of such a relationship (*Hill* v. *Estate of Westbrook* (1950) 95 Cal.App.2d 599, 602 [213 P.2d 727]; see *Hill* v. *Estate of Westbrook* (1952) 39 Cal.2d 458, 460 [247 P.2d 19]; *Barlow* v. *Collins* (1958) 166 Cal.App.2d 274, 277 [333 P.2d 64] (dictum); *Bridges* v. *Bridges* (1954) 125 Cal.App.2d 359, 362 [270 P.2d 69] (dictum)). A review of the numerous California decisions concerning contracts between nonmarital

[3]The colloquy between court and counsel at argument on the motion for judgment on the pleadings suggests that the trial court held the 1964 agreement violated public policy because it derogated the community property rights of Betty Marvin, defendant's lawful wife. Plaintiff, however, offered to amend her complaint to allege that she and defendant reaffirmed their contract after defendant and Betty were divorced. The trial court denied leave to amend, a ruling which suggests that the court's judgment must rest upon some other ground than the assertion that the contract would injure Betty's property rights.

[4]Defendant also contends that the contract was illegal because it contemplated a violation of former Penal Code section 269a, which prohibited living "in a state of cohabitation and adultery." (§ 269a was repealed by Stats. 1975, ch. 71, eff. Jan. 1, 1976.) Defendant's standing to raise the issue is questionable because he alone was married and thus guilty of violating section 269a. Plaintiff, being unmarried could neither be convicted of adulterous cohabitation nor of aiding and abetting defendant's violation. (See *In re Cooper* (1912) 162 Cal. 81, 85-86 [121 P. 318].)

The numerous cases discussing the contractual rights of unmarried couples have drawn no distinction between illegal relationships and lawful nonmarital relationships. (Cf. *Weak* v. *Weak* (1962) 202 Cal.App.2d 632, 639 [21 Cal.Rptr. 9] (bigamous marriage).) Moreover, even if we were to draw such a distinction—a largely academic endeavor in view of the repeal of section 269a—defendant probably would not benefit; his relationship with plaintiff continued long after his divorce became final, and plaintiff sought to amend her complaint to assert that the parties reaffirmed their contract after the divorce.

partners, however, reveals that the courts have not employed such broad and uncertain standards to strike down contracts. The decisions instead disclose a narrower and more precise standard: a contract between nonmarital partners is unenforceable only *to the extent* that it *explicitly* rests upon the immoral and illicit consideration of meretricious sexual services.

In the first case to address this issue, *Trutalli* v. *Meraviglia, supra,* 215 Cal. 698, the parties had lived together without marriage for 11 years and had raised two children. The man sued to quiet title to land he had purchased in his own name during this relationship; the woman defended by asserting an agreement to pool earnings and hold all property jointly. Rejecting the assertion of the illegality of the agreement, the court stated that "The fact that the parties to this action at the time they agreed to invest their earnings in property to be held jointly between them were living together in an unlawful relation, did not disqualify them from entering into a lawful agreement with each other, so long as such immoral relation was not made *a consideration* of their agreement." (Italics added.) (215 Cal. at pp. 701-702.)

In *Bridges* v. *Bridges, supra,* 125 Cal.App.2d 359 [270 P.2d 69], both parties were in the process of obtaining divorces from their erstwhile respective spouses. The two parties agreed to live together, to share equally in property acquired, and to marry when their divorces became final. The man worked as a salesman and used his savings to purchase properties. The woman kept house, cared for seven children, three from each former marriage and one from the nonmarital relationship, and helped construct improvements on the properties. When they separated, without marrying, the court awarded the woman one-half the value of the property. Rejecting the man's contention that the contract was illegal, the court stated that: "Nowhere is it expressly testified to by anyone that there was anything in the agreement for the pooling of assets and the sharing of accumulations that contemplated meretricious relations as any part of the consideration or as any object of the agreement." (125 Cal.App.2d at p. 363.)

*Croslin* v. *Scott* (1957) 154 Cal.App.2d 767 [316 P.2d 755] reiterates the rule established in *Trutalli* and *Bridges.* In *Croslin* the parties separated following a three-year nonmarital relationship. The woman then phoned the man, asked him to return to her, and suggested that he build them a house on a lot she owned. She agreed in return to place the property in joint ownership. The man built the house, and the parties lived there for

several more years. When they separated, he sued to establish his interest in the property. Reversing a nonsuit, the Court of Appeal stated that "The mere fact that parties agree to live together in meretricious relationship does not necessarily make an agreement for disposition of property between them invalid. It is only when the property agreement is made in connection with the other agreement, or the illicit relationship is made a consideration of the property agreement, that the latter becomes illegal." (154 Cal.App.2d at p. 771.)

Numerous other cases have upheld enforcement of agreements between nonmarital partners in factual settings essentially indistinguishable from the present case. (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577 [117 Cal.Rptr. 49]; *Weak* v. *Weak, supra,* 202 Cal.App.2d 632, 639; *Ferguson* v. *Schuenemann* (1959) 167 Cal.App.2d 413 [334 P.2d 668]; *Barlow* v. *Collins, supra,* 166 Cal.App.2d 274, 277-278; *Ferraro* v. *Ferraro* (1956) 146 Cal.App.2d 849 [304 P.2d 168]; *Cline* v. *Festersen* (1954) 128 Cal.App.2d 380 [275 P.2d 149]; *Profit* v. *Profit* (1953) 117 Cal.App.2d 126 [255 P.2d 25]; *Garcia* v. *Venegas, supra,* 106 Cal.App.2d 364; *Padilla* v. *Padilla* (1940) 38 Cal.App.2d 319 [100 P.2d 1093]; *Bacon* v. *Bacon* (1937) 21 Cal.App.2d 540 [69 P.2d 884].)[5]

Although the past decisions hover over the issue in the somewhat wispy form of the figures of a Chagall painting, we can abstract from those decisions a clear and simple rule. ■ The fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property, or expenses. Neither is such an agreement invalid merely because the parties may have contemplated the creation or continuation of a nonmarital relationship when they entered into it. Agreements between nonmarital partners fail only to the extent that they

---

[5]Defendant urges that all of the cited cases, with the possible exception of *In re Marriage of Foster, supra,* 42 Cal.App.3d 577 and *Bridges* v. *Bridges, supra,* 125 Cal.App.2d 359, can be distinguished on the ground that the partner seeking to enforce the contract contributed either property or services additional to ordinary homemaking services. No case, however, suggests that a pooling agreement in which one partner contributes only homemaking services is invalid, and dictum in *Hill* v. *Estate of Westbrook, supra,* 95 Cal.App.2d 599, 603 [213 P.2d 727] states the opposite. A promise to perform homemaking services is, of course, a lawful and adequate consideration for a contract (see *Taylor* v. *Taylor* (1954) 66 Cal.App.2d 390, 398 [152 P.2d 480])—otherwise those engaged in domestic employment could not sue for their wages—and defendant advances no reason why his proposed distinction would justify denial of enforcement to contracts supported by such consideration. (See *Tyranski* v. *Piggins* (1973) 44 Mich.App. 570 [205 N.W.2d 595, 597].)

rest upon a consideration of meretricious sexual services. Thus the rule asserted by defendant, that a contract fails if it is "involved in" or made "in contemplation" of a nonmarital relationship, cannot be reconciled with the decisions.

The three cases cited by defendant which have *declined* to enforce contracts between nonmarital partners involved consideration that *was* expressly founded upon an illicit sexual services. In *Hill* v. *Estate of Westbrook, supra,* 95 Cal.App.2d 599, the woman promised to keep house for the man, to live with him as man and wife, and to bear his children; the man promised to provide for her in his will, but died without doing so. Reversing a judgment for the woman based on the reasonable value of her services, the Court of Appeal stated that "the action is predicated upon a claim which seeks, among other things, the reasonable value of living with decedent in meretricious relationship and bearing him two children. . . . The law does not award compensation for living with a man as a concubine and bearing him children. . . . As the judgment is at least in part, for the value of the claimed services for which recovery cannot be had, it must be reversed." (95 Cal.App.2d at p. 603.) Upon retrial, the trial court found that it could not sever the contract and place an independent value upon the legitimate services performed by claimant. We therefore affirmed a judgment for the estate. (*Hill* v. *Estate of Westbrook* (1952) 39 Cal.2d 458 [247 P.2d 19].)

In the only other cited decision refusing to enforce a contract, *Updeck* v. *Samuel* (1954) 123 Cal.App.2d 264 [266 P.2d 822], the contract "was based on the consideration that the parties live together as husband and wife." (123 Cal.App.2d at p. 267.) Viewing the contract as calling for adultery, the court held it illegal.[6]

---

[6]Although not cited by defendant, the only California precedent which supports his position is *Heaps* v. *Toy* (1942) 54 Cal.App.2d 178 [128 P.2d 813]. In that case the woman promised to leave her job, to refrain from marriage, to be a companion to the man, and to make a permanent home for him; he agreed to support the woman and her child for life. The Court of Appeal held the agreement invalid as a contract in restraint of marriage (Civ. Code, § 1676) and, alternatively, as "contrary to good morals" (Civ. Code, § 1607). The opinion does not state that sexual relations formed any part of the consideration for the contract, nor explain how—unless the contract called for sexual relations—the woman's employment as a companion and housekeeper could be contrary to good morals.

The alternative holding in *Heaps* v. *Toy, supra,* finding the contract in that case contrary to good morals, is inconsistent with the numerous California decisions upholding contracts between nonmarital partners when such contracts are not founded upon an illicit consideration, and is therefore disapproved.

The decisions in the *Hill* and *Updeck* cases thus demonstrate that a contract between nonmarital partners, even if expressly made in contemplation of a common living arrangement, is invalid only if sexual acts form an inseparable part of the consideration for the agreement. In sum, a court will not enforce a contract for the pooling of property and earnings if it is explicitly and inseparably based upon services as a paramour. The Court of Appeal opinion in *Hill*, however, indicates that even if sexual services are part of the contractual consideration, any *severable* portion of the contract supported by independent consideration will still be enforced.

The principle that a contract between nonmarital partners will be enforced unless expressly and inseparably based upon an illicit consideration of sexual services not only represents the distillation of the decisional law, but also offers a far more precise and workable standard than that advocated by defendant. Our recent decision in *In re Marriage of Dawley* (1976) 17 Cal.3d 342 [131 Cal.Rptr. 3, 551 P.2d 323] offers a close analogy. Rejecting the contention that an antenuptial agreement is invalid if the parties contemplated a marriage of short duration, we pointed out in *Dawley* that a standard based upon the subjective contemplation of the parties is uncertain and unworkable; such a test, we stated, "might invalidate virtually all antenuptial agreements on the ground that the parties contemplated dissolution . . . but it provides no principled basis for determining which antenuptial agreements offend public policy and which do not." (17 Cal.3d 342, 352.)

Similarly, in the present case a standard which inquires whether an agreement is "involved" in or "contemplates" a nonmarital relationship is vague and unworkable. Virtually all agreements between nonmarital partners can be said to be "involved" in some sense in the fact of their mutual sexual relationship, or to "contemplate" the existence of that relationship. Thus defendant's proposed standards, if taken literally, might invalidate all agreements between nonmarital partners, a result no one favors. Moreover, those standards offer no basis to distinguish between valid and invalid agreements. By looking not to such uncertain tests, but only to the consideration underlying the agreement, we provide the parties and the courts with a practical guide to determine when an agreement between nonmarital partners should be enforced.

 Defendant secondly relies upon the ground suggested by the trial court: that the 1964 contract violated public policy because it impaired

the community property rights of Betty Marvin, defendant's lawful wife. Defendant points out that his earnings while living apart from his wife before rendition of the interlocutory decree were community property under 1964 statutory law (former Civ. Code, §§ 169, 169.2)[7] and that defendant's agreement with plaintiff purported to transfer to her a half interest in that community property. But whether or not defendant's contract with plaintiff exceeded his authority as manager of the community property (see former Civ. Code, § 172), defendant's argument fails for the reason that an improper transfer of community property is not void *ab initio,* but merely voidable at the instance of the aggrieved spouse. See *Ballinger* v. *Ballinger* (1937) 9 Cal.2d 330, 334 [70 P.2d 629; *Trimble* v. *Trimble* (1933) 219 Cal. 340, 344 [26 P.2d 477].)

In the present case Betty Marvin, the aggrieved spouse, had the opportunity to assert her community property rights in the divorce action. (See *Babbitt* v. *Babbitt* (1955) 44 Cal.2d 289, 293 [282 P.2d 1].) The interlocutory and final decrees in that action fix and limit her interest. Enforcement of the contract between plaintiff and defendant against property awarded to defendant by the divorce decree will not impair any right of Betty's, and thus is not on that account violative of public policy.[8]

Defendant's third contention is noteworthy for the lack of authority advanced in its support. He contends that enforcement of the oral agreement between plaintiff and himself is barred by Civil Code section 5134, which provides that "All contracts for marriage settlements must be in writing. . . ." A marriage settlement, however, is an agreement in contemplation of marriage in which each party agrees to release or modify the property rights which would otherwise arise from the marriage. (See *Corker* v. *Corker* (1891) 87 Cal. 643, 648 [25 P. 922].) The

---

[7]Sections 169 and 169.2 were replaced in 1970 by Civil Code section 5118. In 1972 section 5118 was amended to provide that the earnings and accumulations of *both* spouses "while living separate and apart from the other spouse, are the separate property of the spouse."

[8]Defendant also contends that the contract is invalid as an agreement to promote or encourage divorce. (See 1 Witkin, Summary of Cal. Law (8th ed.) pp. 390-392 and cases there cited.) The contract between plaintiff and defendant did not, however, by its terms require defendant to divorce Betty, nor reward him for so doing. Moreover, the principle on which defendant relies does not apply when the marriage in question is beyond redemption (*Glickman* v. *Collins* (1975) 13 Cal.3d 852, 858-859 [120 Cal.Rptr. 76, 533 P.2d 204]); whether or not defendant's marriage to Betty was beyond redemption when defendant contracted with plaintiff is obviously a question of fact which cannot be resolved by judgment on the pleadings.

contract at issue here does not conceivably fall within that definition, and thus is beyond the compass of section 5134.[9]

Defendant finally argues that enforcement of the contract is barred by Civil Code section 43.5, subdivision (d), which provides that "No cause of action arises for . . . breach of promise of marriage." This rather strained contention proceeds from the premise that a promise of marriage impliedly includes a promise to support and to pool property acquired after marriage (see *Boyd* v. *Boyd* (1964) 228 Cal.App.2d 374 [39 Cal.Rptr. 400]) to the conclusion that pooling and support agreements not part of or accompanied by promise of marriage are barred by the section. We conclude that section 43.5 is not reasonably susceptible to the interpretation advanced by defendant, a conclusion demonstrated by the fact that since section 43.5 was enacted in 1939, numerous cases have enforced pooling agreements between nonmarital partners, and in none did court or counsel refer to section 43.5.

In summary, we base our opinion on the principle that adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights. Of course, they cannot lawfully contract to pay for the performance of sexual services, for such a contract is, in essence, an agreement for prostitution and unlawful for that reason. But they may agree to pool their earnings and to hold all property acquired during the relationship in accord with the law governing community property; conversely they may agree that each partner's earnings and the property acquired from those earnings remains the separate property of the earning partner.[10] So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose, and no policy precludes the courts from enforcing such agreements.

In the present instance, plaintiff alleges that the parties agreed to pool their earnings, that they contracted to share equally in all property

---

[9]Our review of the many ·cases enforcing agreements between nonmarital partners reveals that the majority of such agreements were oral. In two cases (*Ferguson* v. *Schuenemann, supra,* 167 Cal.App.2d 413; *Cline* v. *Festersen, supra,* 128 Cal.App.2d 380), the court expressly rejected defenses grounded upon the statute of frauds.

[10]A great variety of other arrangements are possible. The parties might keep their earnings and property separate, but agree to compensate one party for services which benefit the other. They may choose to pool only part of their earnings and property, to form a partnership or joint venture, or to hold property acquired as joint tenants or tenants in common, or agree to any other such arrangement. (See generally Weitzman, *Legal Regulation of Marriage: Tradition and Change* (1974) 62 Cal.L.Rev. 1169.)

acquired, and that defendant agreed to support plaintiff. The terms of the contract as alleged do not rest upon any unlawful consideration. We therefore conclude that the complaint furnishes a suitable basis upon which the trial court can render declaratory relief. (See 3 Witkin, Cal. Procedure (2d ed.) pp. 2335-2336.) The trial court consequently erred in granting defendant's motion for judgment on the pleadings.

3. *Plaintiff's complaint can be amended to state a cause of action founded upon theories of implied contract or equitable relief.*

As we have noted, both causes of action in plaintiff's complaint allege an express contract; neither assert any basis for relief independent from the contract. In *In re Marriage of Cary, supra,* 34 Cal.App.3d 345, however, the Court of Appeal held that, in view of the policy of the Family Law Act, property accumulated by nonmarital partners in an actual family relationship should be divided equally. Upon examining the *Cary* opinion, the parties to the present case realized that plaintiff's alleged relationship with defendant might arguably support a cause of action independent of any express contract between the parties. The parties have therefore briefed and discussed the issue of the property rights of a nonmarital partner in the absence of an express contract. Although our conclusion that plaintiff's complaint states a cause of action based on an express contract alone compels us to reverse the judgment for defendant, resolution of the *Cary* issue will serve both to guide the parties upon retrial and to resolve a conflict presently manifest in published Court of Appeal decisions.

Both plaintiff and defendant stand in broad agreement that the law should be fashioned to carry out the reasonable expectations of the parties. Plaintiff, however, presents the following contentions: that the decisions prior to *Cary* rest upon implicit and erroneous notions of punishing a party for his or her guilt in entering into a nonmarital relationship, that such decisions result in an inequitable distribution of property accumulated during the relationship, and that *Cary* correctly held that the enactment of the Family Law Act in 1970 overturned those prior decisions. Defendant in response maintains that the prior decisions merely applied common law principles of contract and property to persons who have deliberately elected to remain outside the bounds of the community property system.[11] *Cary,* defendant contends, erred in

---

[11]We note that a deliberate decision to avoid the strictures of the community property system is not the only reason that couples live together without marriage. Some couples

holding that the Family Law Act vitiated the force of the prior precedents.

As we shall see from examination of the pre-*Cary* decisions, the truth lies somewhere between the positions of plaintiff and defendant. The classic opinion on this subject is *Vallera* v. *Vallera, supra,* 21 Cal.2d 681. Speaking for a four-member majority, Justice Traynor posed the question: "whether a woman living with a man as his wife but with no genuine belief that she is legally married to him acquires by reason of cohabitation alone the rights of a co-tenant in his earnings and accumulations during the period of their relationship." (21 Cal.2d at p. 684.) Citing *Flanagan* v. *Capital Nat. Bank* (1931) 213 Cal. 664 [3 P.2d 307], which held that a nonmarital "wife" could not claim that her husband's estate was community property, the majority answered that question "in the negative." (Pp. 684-685.) *Vallera* explains that "Equitable considerations arising from the reasonable expectation of the continuation of benefits attending the status of marriage entered into in good faith are not present in such a case." (P. 685.) In the absence of express contract, *Vallera* concluded, the woman is entitled to share in property jointly accumulated only "in the proportion that her funds contributed toward its acquisition." (P. 685.) Justice Curtis, dissenting, argued that the evidence showed an implied contract under which each party owned an equal interest in property acquired during the relationship.

The majority opinion in *Vallera* did not expressly bar recovery based upon an implied contract, nor preclude resort to equitable remedies. But *Vallera's* broad assertion that equitable considerations "are not present" in the case of a nonmarital relationship (21 Cal.2d at p. 685) led the Courts of Appeal to interpret the language to preclude recovery based on such theories. (See *Lazzarevich* v. *Lazzarevich* (1948) 88 Cal.App.2d 708,

---

may wish to avoid the permanent commitment that marriage implies, yet be willing to share equally any property acquired during the relationship; others may fear the loss of pension, welfare, or tax benefits resulting from marriage (see *Beckman* v. *Mayhew, supra,* 49 Cal.App.3d 529). Others may engage in the relationship as a possible prelude to marriage. In lower socio-economic groups the difficulty and expense of dissolving a former marriage often leads couples to choose a nonmarital relationship; many unmarried couples may also incorrectly believe that the doctrine of common law marriage prevails in California, and thus that they are in fact married. Consequently we conclude that the mere fact that a couple have not participated in a valid marriage ceremony cannot serve as a basis for a court's inference that the couple intend to keep their earnings and property separate and independent; the parties' intention can only be ascertained by a more searching inquiry into the nature of their relationship.

719 [200 P.2d 49]; *Oakley* v. *Oakley* (1947) 82 Cal.App.2d 188, 191-192 [185 P.2d 848].)[12]

Consequently, when the issue of the rights of a nonmarital partner reached this court in *Keene* v. *Keene* (1962) 57 Cal.2d 657 [21 Cal.Rptr. 593, 371 P.2d 329], the claimant forwent reliance upon theories of contract implied in law or fact. Asserting that she had worked on her partner's ranch and that her labor had enhanced its value, she confined her cause of action to the claim that the court should impress a resulting trust on the property derived from the sale of the ranch. The court limited its opinion accordingly, rejecting her argument on the ground that the rendition of services gives rise to a resulting trust only when the services aid in acquisition of the property, not in its subsequent improvement. (57 Cal.2d at p. 668.) Justice Peters, dissenting, attacked the majority's distinction between the rendition of services and the contribution of funds or property; he maintained that both property and services furnished valuable consideration, and potentially afforded the ground for a resulting trust.

This failure of the courts to recognize an action by a nonmarital partner based upon implied contract, or to grant an equitable remedy, contrasts with the judicial treatment of the putative spouse. Prior to the enactment of the Family Law Act, no statute granted rights to a putative spouse.[13] The courts accordingly fashioned a variety of remedies by judicial decision. Some cases permitted the putative spouse to recover half the property on a theory that the conduct of the parties implied an agreement of partnership or joint venture. (See *Estate of Vargas* (1974) 36 Cal.App.3d 714, 717-718 [111 Cal.Rptr. 779]; *Sousa* v. *Freitas* (1970) 10 Cal.App.3d 660, 666 [89 Cal.Rptr. 485].) Others permitted the spouse to recover the reasonable value of rendered services, less the value of support received. (See *Sanguinetti* v. *Sanguinetti* (1937) 9 Cal.2d 95,

---

[12]The cases did not clearly determine whether a nonmarital partner could recover in quantum meruit for the reasonable value of services rendered. But when we affirmed a trial court ruling denying recovery in *Hill* v. *Estate of Westbrook, supra,* 39 Cal.2d 458, we did so in part on the ground that whether the partner "rendered her services because of expectation of monetary reward" (p. 462) was a question of fact resolved against her by the trial court—thus implying that in a proper case the court would allow recovery based on quantum meruit.

[13]The Family Law Act, in Civil Code section 4452, classifies property acquired during a putative marriage as " 'quasi-marital property,' " and requires that such property be divided upon dissolution of the marriage in accord with Civil Code section 4800.

100-102 [69 P.2d 845, 111 A.L.R. 342].)[14] Finally, decisions affirmed the power of a court to employ equitable principles to achieve a fair division of property acquired during putative marriage. (*Coats* v. *Coats* (1911) 160 Cal. 671, 677-678 [118 P. 441]; *Caldwell* v. *Odisio* (1956) 142 Cal.App.2d 732, 735 [299 P.2d 14].)[15]

Thus in summary, the cases prior to *Cary* exhibited a schizophrenic inconsistency. By enforcing an express contract between nonmarital partners unless it rested upon an unlawful consideration, the courts applied a common law principle as to contracts. Yet the courts disregarded the common law principle that holds that implied contracts can arise from the conduct of the parties.[16] Refusing to enforce such contracts, the courts spoke of leaving the parties "in the position in which they had placed themselves" (*Oakley* v. *Oakley, supra,* 82 Cal.App.2d 188, 192), just as if they were guilty parties *in pari delicto.*

Justice Curtis noted this inconsistency in his dissenting opinion in *Vallera,* pointing out that "if an express agreement will be enforced, there is no legal or just reason why an implied agreement to share the property cannot be enforced." (21 Cal.2d 681, 686; see Bruch, *Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services* (1976) 10 Family L.Q. 101, 117-121.) And in *Keene* v. *Keene, supra,* 57 Cal.2d 657, Justice Peters observed that if the

---

[14]The putative spouse need not prove that he rendered services in expectation of monetary reward in order to recover the reasonable value of those services. (*Sanguinetti* v. *Sanguinetti, supra,* 9 Cal.2d 95, 100.)

[15]The contrast between principles governing nonmarital and putative relationships appears most strikingly in *Lazzarevich* v. *Lazzarevich, supra,* 88 Cal.App.2d 708. When Mrs. Lazzarevich sued her husband for divorce in 1945, she discovered to her surprise that she was not lawfully married to him. She nevertheless reconciled with him, and the Lazzareviches lived together for another year before they finally separated. The court awarded her recovery for the reasonable value of services rendered, less the value of support received, until she discovered the invalidity of the marriage, but denied recovery for the same services rendered after that date.

[16]"Contracts may be express or implied. These terms however do not denote different kinds of contracts, but have reference to the evidence by which the agreement between the parties is shown. If the agreement is shown by the direct words of the parties, spoken or written, the contract is said to be an express one. But if such agreement can only be shown by the acts and conduct of the parties, interpreted in the light of the subject matter and of the surrounding circumstances, then the contract is an implied one." (*Skelly* v. *Bristol Sav. Bank* (1893) 63 Conn. 83 [26 A. 474], quoted in 1 Corbin, Contracts (1963) p. 41.) Thus, as Justice Schauer observed in *Desny* v. *Wilder* (1956) 46 Cal.2d 715 [299 P.2d 257], in a sense all contracts made in fact, as distinguished from quasi-contractual obligations, are express contracts, differing only in the manner in which the assent of the parties is expressed and proved. (See 46 Cal.2d at pp. 735-736.)

man and woman "were not illegally living together . . . it would be a plain business relationship and a contract would be implied." (Dis. opn. at p. 672.)

Still another inconsistency in the prior cases arises from their treatment of property accumulated through joint effort. To the extent that a partner had contributed *funds* or *property*, the cases held that the partner obtains a proportionate share in the acquisition, despite the lack of legal standing of the relationship. (*Vallera* v. *Vallera, supra,* 21 Cal.2d at p. 685; see *Weak* v. *Weak, supra,* 202 Cal.App.2d 632, 639.) Yet courts have refused to recognize just such an interest based upon the contribution of *services.* As Justice Curtis points out "Unless it can be argued that a woman's services as cook, housekeeper, and homemaker are valueless, it would seem logical that if, when she contributes money to the purchase of property, her interest will be protected, then when she contributes her services in the home, her interest in property accumulated should be protected." (*Vallera* v. *Vallera, supra,* 21 Cal.2d 681, 686-687 (dis. opn.); see Bruch, *op. cit., supra,* 10 Family L.Q. 101, 110-114; Article, *Illicit Cohabitation: The Impact of the Vallera and Keene Cases on the Rights of the Meretricious Spouse* (1973) 6 U.C. Davis L.Rev. 354, 369-370; Comment (1972) 48 Wash.L.Rev. 635, 641.)

Thus as of 1973, the time of the filing of *In re Marriage of Cary, supra,* 34 Cal.App.3d 345, the cases apparently held that a nonmarital partner who rendered services in the absence of express contract could assert no right to property acquired during the relationship. The facts of *Cary* demonstrated the unfairness of that rule.

Janet and Paul Cary had lived together, unmarried, for more than eight years. They held themselves out to friends and family as husband and wife, reared four children, purchased a home and other property, obtained credit, filed joint income tax returns, and otherwise conducted themselves as though they were married. Paul worked outside the home, and Janet generally cared for the house and children.

In 1971 Paul petitioned for "nullity of the marriage."[17] Following a hearing on that petition, the trial court awarded Janet half the property acquired during the relationship, although all such property was traceable to Paul's earnings. The Court of Appeal affirmed the award.

---

[17]The Court of Appeal opinion in *In re Marriage of Cary, supra,* does not explain why Paul Cary filed his action as a petition for nullity. Briefs filed with this court, however, suggest that Paul may have been seeking to assert rights as a putative spouse. In the

Reviewing the prior decisions which had denied relief to the home-making partner, the Court of Appeal reasoned that those decisions rested upon a policy of punishing persons guilty of cohabitation without marriage. The Family Law Act, the court observed, aimed to eliminate fault or guilt as a basis for dividing marital property. But once fault or guilt is ·excluded, the court reasoned, nothing distinguishes the property rights of a nonmarital "spouse" from those of a putative spouse. Since the latter is entitled to half the " 'quasi marital property' " (Civ. Code, § 4452), the Court of Appeal concluded that, giving effect to the policy of the Family Law Act, a nonmarital cohabitator should also be entitled to half the property accumulated during an "actual family relationship." (34 Cal.App.3d at p. 353.)[18]

present case, on the other hand, neither party claims the status of an actual or putative spouse. Under such circumstances an action to adjudge "the marriage" in the instant case a nullity would be pointless and could not serve as a device to adjudicate contract and property rights arising from the parties' nonmarital relationship. Accordingly, plaintiff here correctly chose to assert her rights by means of an ordinary civil action.

[18]The court in *Cary* also based its decision upon an analysis of Civil Code section 4452, which specifies the property rights of a putative spouse. Section 4452 states that if the "court finds that either party or both parties believed in good faith that the marriage was valid, the court should declare such party or parties to have the status of a putative spouse, and, . . . shall divide, in accordance with Section 4800, that property acquired during the union . . . ." Since section 4800 requires an equal division of community property, *Cary* interpreted section 4452 to require an equal division of the property of a putative marriage, so long as one spouse believed in good faith that the marriage was valid. Thus under section 4452, *Cary* concluded, the "guilty spouse" (the spouse who knows the marriage is invalid) has the same right to half the property as does the "innocent" spouse.

*Cary* then reasoned that if the "guilty" spouse to a putative marriage is entitled to one-half the marital property, the "guilty" partner in a nonmarital relationship should also receive one-half of the property. Otherwise, the court stated, "We should be obliged to presume a legislative intent that a person, who by deceit leads another to believe a valid marriage exists between them, shall be legally guaranteed half of the property they acquire even though most, or all, may have resulted from the earnings of the blameless partner. At the same time we must infer an inconsistent legislative intent that two persons who, candidly with each other, enter upon an unmarried family relationship, shall be denied any judicial aid whatever in the assertion of otherwise valid property rights." (34 Cal.App.3d at p. 352.)

This reasoning in *Cary* has been criticized by commentators. (See Note, *op. cit., supra,* 25 Hastings L.J. 1226, 1234-1235; Comment, *In re Marriage of Carey* [*sic*]: *The End of the Putative-Meretricious Spouse Distinction in California* (1975) 12 San Diego L.Rev. 436, 444-446.) The commentators note that Civil Code section 4455 provides that an "innocent" party to a putative marriage can recover spousal support, from which they infer that the Legislature intended to give only the "innocent" spouse a right to one-half of the quasi-marital property under section 4452.

We need not now resolve this dispute concerning the interpretation of section 4452. Even if *Cary* is correct in holding that a "guilty" putative spouse has a right to one-half of the marital property, it does not necessarily follow that a nonmarital partner has an identical right. In a putative marriage the parties will arrange their economic affairs with the expectation that upon dissolution the property will be divided equally. If a "guilty"

*Cary* met with a mixed reception in other appellate districts. In *Estate of Atherley, supra,* 44 Cal.App.3d 758, the Fourth District agreed with *Cary* that under the Family Law Act a nonmarital partner in an actual family relationship enjoys the same right to an equal division of property as a putative spouse. In *Beckman* v. *Mayhew, supra,* 49 Cal.App.3d 529, however, the Third District rejected *Cary* on the ground that the Family Law Act was not intended to change California law dealing with nonmarital relationships.

■ If *Cary* is interpreted as holding that the Family Law Act requires an equal division of property accumulated in nonmarital "actual family relationships," then we agree with *Beckman* v. *Mayhew* that *Cary* distends the act. No language in the Family Law Act addresses the property rights of nonmarital partners, and nothing in the legislative history of the act suggests that the Legislature considered that subject.[19] The delineation of the rights of nonmarital partners before 1970 had been fixed entirely by judicial decision; we see no reason to believe that the Legislature, by enacting the Family Law Act, intended to change that state of affairs.

But although we reject the reasoning of *Cary* and *Atherley,* we share the perception of the *Cary* and *Atherley* courts that the application of former precedent in the factual setting of those cases would work an unfair distribution of the property accumulated by the couple. Justice Friedman in *Beckman* v. *Mayhew, supra,* 49 Cal.App.3d 529, 535, also questioned the continued viability of our decisions in *Vallera* and *Keene*; commentators have argued the need to reconsider those precedents.[20] We should not, therefore, reject the authority of *Cary* and *Atherley* without also examining the deficiencies in the former law which led to those decisions.

putative spouse receives one-half of the property under section 4452, no expectation of the "innocent" spouse has been frustrated. In a nonmarital relationship, on the other hand, the parties may expressly or tacitly determine to order their economic relationship in some other manner, and to impose community property principles regardless of such understanding may frustrate the parties' expectations.

[19]Despite the extensive material available on the legislative history of the Family Law Act neither *Cary* nor plaintiff cites any reference which suggests that the Legislature ever considered the issue of the property rights of nonmarital partners, and our independent examination has uncovered no such reference.

[20]See Bruch, *op. cit., supra,* 10 Family L.Q. 101, 113; Article, *op. cit., supra,* 6 U.C. Davis L.Rev. 354; Comment (1975) 6 Golden Gate L.Rev. 179, 197-201; Comment, *op. cit., supra,* 12 San Diego L.Rev. 436; Note, *op. cit., supra,* 25 Hastings L.J. 1226, 1246.

The principal reason why the pre-*Cary* decisions result in an unfair distribution of property inheres in the court's refusal to permit a nonmarital partner to assert rights based upon accepted principles of implied contract or equity. We have examined the reasons advanced to justify this denial of relief, and find that none have merit.

First, we note that the cases denying relief do not rest their refusal upon any theory of "punishing" a "guilty" partner. Indeed, to the extent that denial of relief "punishes" one partner, it necessarily rewards the other by permitting him to retain a disproportionate amount of the property. Concepts of "guilt" thus cannot justify an unequal division of property between two equally "guilty" persons.[21]

Other reasons advanced in the decisions fare no better. The principal argument seems to be that "[e]quitable considerations arising from the reasonable expectation of . . . benefits attending the status of marriage . . . are not present [in a nonmarital relationship]." (*Vallera* v. *Vallera, supra,* 21 Cal.2d at p. 685.) But, although parties to a nonmarital relationship obviously cannot have based any expectations upon the belief that they were married, other expectations and equitable considerations remain. The parties may well expect that property will be divided in accord with the parties' own tacit understanding and that in the absence of such understanding the courts will fairly apportion property accumulated through mutual effort. We need not treat nonmarital partners as putatively married persons in order to apply principles of implied contract, or extend equitable remedies; we need to treat them only as we do any other unmarried persons.[22]

---

[21]Justice Finley of the Washington Supreme Court explains: "Under such circumstances [the dissolution of a nonmarital relationship], this court and the courts of other jurisdictions have, in effect, sometimes said, 'We will wash our hands of such disputes. The parties should and must be left to their own devices, just where they find themselves.' To me, such pronouncements seem overly fastidious and a bit fatuous. They are unrealistic and, among other things, ignore the fact that an unannounced (but nevertheless effective and binding) rule of law is inherent in any such terminal statements by a court of law. The unannounced but inherent rule is simply that the party who has title, or in some instances who is in possession, will enjoy the rights of ownership of the property concerned. The rule often operates to the great advantage of the cunning and the shrewd, who wind up with possession of the property, or title to it in their names, at the end of a so-called meretricious relationship. So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties." (*West* v. *Knowles* (1957) 50 Wn.2d 311 [311 P.2d 689, 692] (conc. opn.).)

[22]In some instances a confidential relationship may arise between nonmarital partners, and economic transactions between them should be governed by the principles applicable to such relationships.

The remaining arguments advanced from time to time to deny remedies to the nonmarital partners are of less moment. There is no more reason to presume that services are contributed as a gift than to presume that funds are contributed as a gift; in any event the better approach is to presume, as Justice Peters suggested, "that the parties intend to deal fairly with each other." (*Keene* v. *Keene, supra,* 57 Cal.2d 657, 674 (dissenting opn.); see Bruch, *op. cit., supra,* 10 Family L.Q. 101, 113.)

The argument that granting remedies to the nonmarital partners would discourage marriage must fail; as *Cary* pointed out, "with equal or greater force the point might be made that the pre-1970 rule was calculated to cause the income-producing partner to avoid marriage and thus retain the benefit of all of his or her accumulated earnings." (34 Cal.App.3d at p. 353.) Although we recognize the well-established public policy to foster and promote the institution of marriage (see *Deyoe* v. *Superior Court* (1903) 140 Cal. 476, 482 [74 P. 28]), perpetuation of judicial rules which result in an inequitable distribution of property accumulated during a nonmarital relationship is neither a just nor an effective way of carrying out that policy.

In summary, we believe that the prevalence of nonmarital relationships in modern society and the social acceptance of them, marks this as a time when our courts should by no means apply the doctrine of the unlawfulness of the so-called meretricious relationship to the instant case. As we have explained, the nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, as the word suggests, pertained to and encompassed prostitution. To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice.

We are aware that many young couples live together without the solemnization of marriage, in order to make sure that they can successfully later undertake marriage. This trial period,[23] preliminary to marriage, serves as some assurance that the marriage will not subsequently end in dissolution to the harm of both parties. We are aware, as we have stated, of the pervasiveness of nonmarital relationships in other situations.

---

[23]Toffler, Future Shock (Bantam Books, 1971) page 253.

The mores of the society have indeed changed so radically in regard to cohabitation that we cannot impose a standard based on alleged moral considerations that have apparently been so widely abandoned by so many. Lest we be misunderstood, however, we take this occasion to point out that the structure of society itself largely depends upon the institution of marriage, and nothing we have said in this opinion should be taken to derogate from that institution. The joining of the man and woman in marriage is at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime.

 We conclude that the judicial barriers that may stand in the way of a policy based upon the fulfillment of the reasonable expectations of the parties to a nonmarital relationship should be removed. As we have explained, the courts now hold that express agreements will be enforced unless they rest on an unlawful meretricious consideration. We add that in the absence of an express agreement, the courts may look to a variety of other remedies in order to protect the parties' lawful expectations.[24]

The courts may inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract or implied agreement of partnership or joint venture (see *Estate of Thornton* (1972) 81 Wn.2d 72 [499 P.2d 864]), or some other tacit understanding between the parties. The courts may, when appropriate, employ principles of constructive trust (see *Omer* v. *Omer* (1974) 11 Wash.App. 386 [523 P.2d 957]) or resulting trust (see *Hyman* v. *Hyman* (Tex.Civ.App. 1954) 275 S.W.2d 149). Finally, a nonmarital partner may recover in quantum meruit for the reasonable value of household services rendered less the reasonable value of support received if he can show that he rendered services with the expectation of monetary reward. (See *Hill* v. *Estate of Westbrook, supra,* 39 Cal.2d 458, 462.)[25]

Since we have determined that plaintiff's complaint states a cause of action for breach of an express contract, and, as we have explained, can

---

[24]We do not seek to resurrect the doctrine of common law marriage, which was abolished in California by statute in 1895. (See *Norman* v. *Thomson* (1898) 121 Cal. 620, 628 [54 P. 143]; *Estate of Abate* (1958) 166 Cal.App.2d 282, 292 [333 P.2d 200].) Thus we do not hold that plaintiff and defendant were "married," nor do we extend to plaintiff the rights which the Family Law Act grants valid or putative spouses; we hold only that she has the same rights to enforce contracts and to assert her equitable interest in property acquired through her effort as does any other unmarried person.

[25]Our opinion does not preclude the evolution of additional equitable remedies to protect the expectations of the parties to a nonmarital relationship in cases in which existing remedies prove inadequate; the suitability of such remedies may be determined in later cases in light of the factual setting in which they arise.

be amended to state a cause of action independent of allegations of express contract,[26] we must conclude that the trial court erred in granting defendant a judgment on the pleadings.

The judgment is reversed and the cause remanded for further proceedings consistent with the views expressed herein.[27]

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., and Richardson, J., concurred.

**CLARK, J.,** Concurring and Dissenting.—The majority opinion properly permit recovery on the basis of either express or implied in fact agreement between the parties. These being the issues presented, their resolution requires reversal of the judgment. Here, the opinion should stop.

This court should not attempt to determine all anticipated rights, duties and remedies within every meretricious relationship—particularly in vague terms. Rather, these complex issues should be determined as each arises in a concrete case.

The majority broadly indicate that a party to a meretricious relationship may recover on the basis of equitable principles and in quantum meruit. However, the majority fail to advise us of the circumstances permitting recovery, limitations on recovery, or whether their numerous remedies are cumulative or exclusive. Conceivably, under the majority opinion a party may recover half of the property acquired during the relationship on the basis of general equitable principles, recover a bonus based on specific equitable considerations, and recover a second bonus in quantum meruit.

The general sweep of the majority opinion raises but fails to answer several questions. First, because the Legislature specifically excluded some parties to a meretricious relationship from the equal division rule of Civil Code section 4452, is this court now free to create an equal division rule? Second, upon termination of the relationship, is it equitable to impose the economic obligations of lawful spouses on

---

[26]We do not pass upon the question whether, in the absence of an express or implied contractual obligation, a party to a nonmarital relationship is entitled to support payments from the other party after the relationship terminates.

[27]We wish to commend the parties and amici for the exceptional quality of the briefs and argument in this case.

meretricious parties when the latter may have rejected matrimony to avoid such obligations? Third, does not application of equitable principles—necessitating examination of the conduct of the parties—violate the spirit of the Family Law Act of 1969, designed to eliminate the bitterness and acrimony resulting from the former fault system in divorce? Fourth, will not application of equitable principles reimpose upon trial courts the unmanageable burden of arbitrating domestic disputes? Fifth, will not a quantum meruit system of compensation for services—discounted by benefits received—place meretricious spouses in a better position than lawful spouses? Sixth, if a quantum meruit system is to be allowed, does fairness not require inclusion of all services and all benefits regardless of how difficult the evaluation?

When the parties to a meretricious relationship show by express or implied in fact agreement they intend to create mutual obligations, the courts should enforce the agreement. However, in the absence of agreement, we should stop and consider the ramifications before creating economic obligations which may violate legislative intent, contravene the intention of the parties, and surely generate undue burdens on our trial courts.

By judicial overreach, the majority perform a nunc pro tunc marriage, dissolve it, and distribute its property on terms never contemplated by the parties, case law or the Legislature.