695 So.2d 759 (1997)
Emma POSIK, Appellant,
v.
Nancy L.R. LAYTON, Appellee.
No. 96-2192.
District Court of Appeal of Florida, Fifth District.
March 27, 1997.
Rehearing Denied June 11, 1997.
*760 Herbert L. Allen, Jr. of Allen & Billington, P.A., Indian Harbour Beach, for Appellant Emma Posik.
J. John Barker, Melbourne, for Appellee.
HARRIS, Judge.
Emma Posik and Nancy L.R. Layton were close friends and more. They entered into a support agreement much like a prenuptial agreement. The trial court found that the agreement was unenforceable because of waiver. We reverse.
Nancy Layton was a doctor practicing at the Halifax Hospital in Volusia County and Emma Posik was a nurse working at the same facility when Dr. Layton decided to remove her practice to Brevard County. In order to induce Ms. Posik to give up her job and sell her home in Volusia County, to accompany her to Brevard County, and to reside with her "for the remainder of Emma Posik's life to maintain and care for the home," Dr. Layton agreed that she would provide essentially all of the support for the two, would make a will leaving her entire estate to Ms. Posik, and would "maintain bank accounts and other investments which constitute non-probatable assets in Emma Posik's name to the extent of 100% of her entire non-probatable assets." Also, as part of the agreement, Ms. Posik agreed to loan Dr. Layton $20,000 which was evidenced by a note. The agreement provided that Ms. Posik could cease residing with Dr. Layton if Layton failed to provide adequate support, if she requested in writing that Ms. Posik leave for any reason, if she brought a third person into the home for a period greater than four weeks without Ms. Posik's consent, or if her abuse, harassment or abnormal behavior made Ms. Posik's continued residence intolerable. In any such event, Dr. Layton agreed to pay as liquidated damages the sum of $2,500 per month for the remainder of Ms. Posik's life.
It is apparent that Ms. Posik required this agreement as a condition of accompanying Dr. Layton to Brevard. The agreement was drawn by a lawyer and properly witnessed. Ms. Posik, fifty-five years old at the time of the agreement, testified that she required the agreement because she feared that Dr. Layton might become interested in a younger companion. Her fears were well founded. Some four years after the parties moved to Brevard County and without Ms. Posik's consent, Dr. Layton announced that she wished to move another woman into the house. When Ms. Posik expressed strong displeasure with this idea, Dr. Layton moved out and took up residence with the other woman.
Dr. Layton served a three-day eviction notice on Ms. Posik. Ms. Posik later moved from the home and sued to enforce the terms of the agreement and to collect on the note evidencing the loan made in conjunction with the agreement. Dr. Layton defended on the basis that Ms. Posik first breached the agreement. Dr. Layton counterclaimed for a declaratory judgment as to whether the liquidated damages portion of the agreement was enforceable.
The trial judge found that because Ms. Posik's economic losses were reasonably ascertainable as to her employment and relocation costs, the $2,500 a month payment upon breach amounted to a penalty and was therefore unenforceable. The court further found that although Dr. Layton had materially *761 breached the contract within a year or so of its creation, Ms. Posik waived the breach by acquiescence. Finally, the court found that Ms. Posik breached the agreement by refusing to continue to perform the house work, yard work and cooking for the parties and by her hostile attitude which required Dr. Layton to move from the house. Although the trial court determined that Ms. Posik was entitled to quantum meruit, it also determined that those damages were off-set by the benefits Ms. Posik received by being permitted to live with Dr. Layton. The court did award Ms. Posik a judgment on the note executed by Dr. Layton.
Although neither party urged that this agreement was void as against public policy, Dr. Layton's counsel on more than one occasion reminded us that the parties had a sexual relationship. Certainly, even though the agreement was couched in terms of a personal services contract, it was intended to be much more. It was a nuptial agreement entered into by two parties that the state prohibits from marrying. But even though the state has prohibited same-sex marriages and same-sex adoptions, it has not prohibited this type of agreement. By prohibiting same-sex marriages, the state has merely denied homosexuals the rights granted to married partners that flow naturally from the marital relationship. In short, "the law of Florida creates no legal rights or duties between live-ins." Lowry v. Lowry, 512 So.2d 1142 (Fla. 5th DCA 1987). (Sharp, J., concurring specially). This lack of recognition of the rights which flow naturally from the break-up of a marital relationship applies to unmarried heterosexuals as well as homosexuals. But the State has not denied these individuals their right to either will their property as they see fit nor to privately commit by contract to spend their money as they choose. The State is not thusly condoning the lifestyles of homosexuals or unmarried live-ins; it is merely recognizing their constitutional private property and contract rights.
Even though no legal rights or obligations flow as a matter of law from a non-marital relationship, we see no impediment to the parties to such a relationship agreeing between themselves to provide certain rights and obligations. Other states have approved such individual agreements. In Marvin v. Marvin, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976), the California Supreme Court held:
[W]e base our opinion on the principle that adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights.... So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose....
In Whorton v. Dillingham, 202 Cal.App.3d 447, 248 Cal.Rptr. 405 (1988), the California Fourth District Court of Appeal extended this principle to same-sex partners. We also see no reason for a distinction.
The Ohio Court of Appeal also seemed to recognize this principle in Seward v. Mentrup, 87 Ohio App.3d 601, 622 N.E.2d 756, 757 (1993):
Appellant contends that she is entitled to a legal or equitable division of the property accumulated by the parties' joint efforts during the time they lived together. It is appellant's belief that her relationship with appellee was "more like a marriage," and that consequently, she is entitled to reimbursement for money she contributed toward capital improvements to appellee's residence....
The evidentiary materials clearly indicate that there were no written contracts or agreements governing the parties' [lesbian] relationship ...
Based upon Lauper [v. Harold, 23 Ohio App.3d 168, 492 N.E.2d 472, 474 (1985)], a property division, per se, applies only to marriages. We see no reason to deviate from this position. Accordingly, the trial court had no authority to divide property absent a marriage contract or similar agreement, and the court correctly granted summary judgment to appellee on appellant's breach of contract claim. (Emphasis added).
In a case involving unmarried heterosexuals, a Florida appellate court has passed on *762 the legality of a non-marital support agreement. In Crossen v. Feldman, 673 So.2d 903 (Fla. 2d DCA 1996), the court held:
Without attempting to define what may or may not be "palimony," this case simply involves whether these parties entered into a contract for support, which is something that they are legally capable of doing.
Addressing the invited issue, we find that an agreement for support between unmarried adults is valid unless the agreement is inseparably based upon illicit consideration of sexual services. Certainly prostitution, heterosexual or homosexual, cannot be condoned merely because it is performed within the confines of a written agreement. The parties, represented by counsel, were well aware of this prohibition and took pains to assure that sexual services were not even mentioned in the agreement. That factor would not be decisive, however, if it could be determined from the contract or from the conduct of the parties that the primary reason for the agreement was to deliver and be paid for sexual services. See Bergen v. Wood, 14 Cal.App.4th 854, 18 Cal.Rptr.2d 75 (1993). This contract and the parties' testimony show that such was not the case here. Because of the potential abuse in marital-type relationships, we find that such agreements must be in writing. The Statute of Frauds (section 725.01, Florida Statutes) requires that contracts made upon consideration of marriage must be in writing. This same requirement should apply to non-marital, nuptial-like agreements. In this case, there is (and can be) no dispute that the agreement exists.
The obligations imposed on Ms. Posik by the agreement include the obligation "to immediately commence residing with Nancy L.R. Layton at her said residence for the remainder of Emma Posik's life...." This is very similar to a "until death do us part" commitment. And although the parties undoubtedly expected a sexual relationship, this record shows that they contemplated much more. They contracted for a permanent sharing of, and participating in, one another's lives. We find the contract enforceable.
We disagree with the trial court that waiver was proved in this case. Ms. Posik consistently urged Dr. Layton to make the will as required by the agreement and her failure to do so was sufficient grounds to declare default. And even more important to Ms. Posik was the implied agreement that her lifetime commitment would be reciprocated by a lifetime commitment by Dr. Laytonand that this mutual commitment would be monogamous. When Dr. Layton introduced a third person into the relationship, although it was not an express breach of the written agreement, it explains why Ms. Posik took that opportunity to hold Dr. Layton to her express obligations and to consider the agreement in default.
We also disagree with the trial court that Ms. Posik breached the agreement by refusing to perform housework, yard work, provisioning the house, and cooking for the parties. This conduct did not occur until after Dr. Layton had first breached the agreement. One need not continue to perform a contract when the other party has first breached. City of Miami Beach v. Carner, 579 So.2d 248 (Fla. 3d DCA 1991). Therefore, this conduct did not authorize Dr. Layton to send the three-day notice of eviction which constituted a separate default under the agreement.
We also disagree that the commitment to pay $2,500 per month upon termination of the agreement is unenforceable as a penalty. We agree with Ms. Posik that her damages, which would include more than mere lost wages and moving expenses, were not readily ascertainable at the time the contract was created. Further, the agreed sum is reasonable under the circumstances of this case. It is less than Ms. Posik was earning some four years earlier when she entered into this arrangement. It is also less than Ms. Posik would have received had the long-term provisions of the contract been performed. She is now in her sixties and her working opportunities are greatly reduced.
We recognize that this contract, insisted on by Ms. Posik before she would relocate with Dr. Layton, is extremely favorable to her. But there is no allegation of fraud or overreaching on Ms. Posik's part. This court *763 faced an extremely generous agreement in Carnell v. Carnell, 398 So.2d 503 (Fla. 5th DCA 1981). In Carnell, a lawyer, in order to induce a woman to become his wife, agreed that upon divorce the wife would receive his home owned by him prior to marriage, one-half of his disposable income and one-half of his retirement as alimony until she remarried. Two years after the marriage, she tested his commitment. We held:
The husband also contends that the agreement is so unfair and unreasonable that it must be set aside ... "The freedom to contract includes the right to make a bad bargain." (Citation omitted). The controlling question here is whether there was overreaching and not whether the bargain was good or bad.
398 So.2d at 506.
Contracts can be dangerous to one's well-being. That is why they are kept away from children. Perhaps warning labels should be attached. In any event, contracts should be taken seriously. Dr. Layton's comment that she considered the agreement a sham and never intended to be bound by it shows that she did not take it seriously. That is regrettable.
We affirm that portion of the judgment below which addresses the promissory note and attorney's fees and costs associated therewith. We reverse that portion of the judgment that fails to enforce the parties' agreement.
AFFIRMED in part; REVERSED in part and REMANDED for further action consistent with this opinion.
GOSHORN, J., concurs.
PETERSON, C.J., concurs specially, with opinion.
PETERSON, Chief Judge, concurring specially.
Partially quoting from Crossen v. Feldman, 673 So.2d 903 (Fla.2d DCA 1996), "this case simply involves whether [Emma Posik and Nancy L. R. Layton] ... entered into a contract for support, which is something that they are legally capable of doing."
In the instant case, two persons entered into a lifetime personal services contract Posik managed a household exclusively for Layton, who was engaged in a demanding medical practice, and Layton was to provide monetary support and living quarters for Posik, who sacrificed her own professional career as a nurse to manage a household. Posik's reward, if she outlived Layton, and if Layton fared well in her professional endeavors, was a golden parachuteLayton's assets upon Layton's death. Each and every term of this agreement could have been included in one between a single invalid or an elderly married couple who seek the companionship and household services of a housekeeper, cook or a practical or professional nurse, in which no sexual relationship was involved.
The result reached by us in this case should not be interpreted as anything more than a recognition that legally competent individuals may exercise their constitutional private property and contract rights. Much has been included in the opinion about the lifestyles of the litigants in this case because of arguments presented at trial and on appeal. But as Judge Harris accurately points out, neither this contract, nor the parties' testimony, reflects that the reason for this agreement was the delivery and payment for a sexual relationship or a same sex marriage, both of which are not recognized by the laws of Florida.