691 P.2d 713

**Rose Marie COOK, aka Elsten, Plaintiff/Appellant,**

v.

**Donald COOK, Defendant/Appellee.**

**No. 2 CA–CIV 4979.**

Court of Appeals of Arizona, Division 2.

March 7, 1984.

Croswell & Cornelio by Carmine Cornelio, Tucson, for plaintiff/appellant.

Messing & Glicksman, P.C. by Elliot Glicksman, Tucson, for defendant/appellee.

OPINION

HATHAWAY, Judge.

This appeal arises following the second of two superior court judgments. The first one, entered March 28, 1983, granted relief to the plaintiff, Rose Marie Cook (now known as Rose Elsten). Post-judgment cross-motions for amended judgment or a new trial were filed. On May 16, 1983, the trial court vacated its original judgment because it was persuaded that the judgment dated March 28, 1983, did not award the relief sought by the plaintiff in her pleadings or at trial and it had therefore exceeded its jurisdiction in the case. Plaintiff's motion to amend the second judgment and/or for a new trial was denied, hence this appeal.

In 1969, Rose Elsten, 17 years old at the time, moved to Tucson with Don Cook, then 40 years old. At the time of the move, Don was finalizing his divorce from another woman. When they arrived here, they moved into an apartment together and Rose began using Don's last name. They represented themselves to the community as husband and wife, signing various legal documents and tax returns as Don and Rose Cook. Don began working as a shoe salesman for Bill Lewis Shoes as soon as they arrived in Tucson; Rose started a job in another shoe store about 10 days later. Throughout the 12 years they lived together, Don always had a higher salary than Rose. Rose was employed most of the time and contributed her salary to the "community." Both parties admitted an intention to share equally in the various joint assets. Don's admission was based on his further intention that the parties would marry. While Rose admitted that they intended to marry, she contends the assets were not being shared equally based only on that intent.

During the period of cohabitation, two bank accounts were opened by "the Cooks" as joint tenants with the right of survivorship. Don opened an account with the Arizona Credit Union initially with his funds and in his name only, but soon changed the name on the account to reflect the joint tenancy. The evidence indicates that Don contributed about 80 per cent of the money held in this account. A checking account was also opened in both names, with contributions of unknown proportions made by both parties. Apparently the funds in both of these accounts were used to pay for household expenses and various capital assets they had purchased.

In October 1972, Don and Rose bought a house for $21,250. They obtained a Veteran's Administration loan for virtually the entire sum using Don's veteran status. Later in the relationship, while Rose was employed by Southwest Gas, they purchased shares of Southwest Gas stock as a result of an offer by Southwest made to its employees. The stock was purchased by both parties and held by them as joint owners. At various other times until 1981, the couple made large purchases together, acquiring household furniture and two cars.

In June 1981, Rose moved out, telling Don she needed some time to be alone. She packed her bags and moved in with a friend for a short time. She later moved into an apartment. The day she left, she told Don that she was "not going to be like other women" and that she didn't "want anything." These statements were apparently based on Rose's perception of the tenor of Don's divorce, during which Don's first wife apparently demanded most of his money and the community possessions. Don gave her a book with checks in it and told her there was $1,000 in the account that she could use. At the time Rose left, the account had a balance of approximately $3,000. She used $480 and returned the remaining checks.

Two days after she left, Rose and her new roommate, Donna Hawley, went out for several hours. Don had called prior to their leaving, asking Rose to meet with him later that evening. She refused. When Donna and Rose returned, Don came and took the car. The next day, Rose went to the credit union to withdraw some money. She wrote two checks, one for $3,000 representing her claimed half interest in the account funds and the other for $2,000, to give to Don in order to secure the return of her car. The balance in the amount at the time was approximately $6,150. The credit union approved the checks and Rose cashed them at the bank. A short time later, the bank and the credit union demanded the return of the money, which she then gave to Don to return. Rose eventually received her car but never received any of the credit union funds.

At some point during the weeks following Rose's departure, Don sold the Southwest Gas stock without Rose's consent. He received between $4,400 and $5,000 from the sale, which he used to buy other stock. Rose never received any of the stock proceeds.

Finally, on July 9, Don succeeded in getting Rose's signature on a quitclaim deed transferring ownership of the house to Don. She established that she suffered from Crohn's disease, a chronic ailment afflicting the lower intestines, which is aggravated by stress and can be life-threatening in its extreme form. She also established that Don called her many times during the 11 days following her departure. She alleges that he threatened to kill both of them at her job, an allegation which he denies. She signed the deed without advice of counsel, allegedly to reduce the stress in her life and to prevent aggravation of her illness.

In November 1981, Rose sued Don on the theory of implied partnership, seeking an accounting of the partnership assets. The complaint alleged that during the relationship she made contributions of labor and money to the disputed community assets and that Don breached the partnership agreement by acquiring more than one-half of the assets. It claimed that Don's actions were inequitable and sought Rose's

one-half interest in the bank accounts and Southwest Gas stock, legal title to one car, $2,000 representing her interest in the furniture, rescission of the quitclaim deed and sale of the house, attorney's fees and "such other and further relief as the Court deems just and proper."

As mentioned at the outset, the trial court held for the plaintiff initially, finding an implied partnership between the parties. It held that Rose never intended to make a gift of her contribution to the community assets to Don, a finding clearly supported by the record. It divided the assets in accordance with the way the parties' intended to hold them. It awarded Rose her contribution to the credit union account and the house because it was found the intent was not that they share these assets equally. The remaining accounts were divided equally. It subsequently vacated this judgment.

The critical issue in this case is whether the relief originally awarded was outside the scope of the pleadings and proof. Since the parties were not married, the question is whether Rose was entitled to her contributive share of the various assets under the pleadings filed and evidence submitted.

We note initially that this is not a so-called "palimony" suit, contrary to appellee's arguments. The "palimony" suit is generally framed as a request for an equal share of community assets acquired during a non-marital, meretricious relationship when one party provides household services and the other party brings income into the household. See, e.g., *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976). In this case, both parties earned a living outside the home and contributed those earnings to the jointly held property.

■ Contrary to appellant's argument at trial and on appeal, however, Arizona is not a jurisdiction which will permit division of property acquired during a non-marital cohabitation arrangement in accordance with the intent of the parties. That would be the equivalent of dividing the assets ac-

cording to the rules of community property without requiring a valid marriage. It is a valid marriage, and not a non-marital cohabitation situation which is treated as a partnership for purposes of dividing assets. See *Ackel v. Ackel*, 57 Ariz. 14, 110 P.2d 238 (1941). The case of *Fernandez v. Garza*, 88 Ariz. 214, 354 P.2d 260 (1960), is inapposite here because the parties in *Fernandez* were business partners before they became lovers, thus validating the partnership treatment applied there.

■ The trial court's theory regarding implied partnership in this case was incorrect and an erroneous basis for finding in plaintiff's favor. Rather, the circumstances of this case present a man and a woman cohabitating with an agreement to pool their earnings and share equally in their joint accumulations. "[E]quity will protect the interests of each in such property." *Garza v. Fernandez*, 74 Ariz. 312, 316, 248 P.2d 869, 871 (1952), quoting from *Vallera v. Vallera*, 21 Cal.2d 681, 134 P.2d 761, 763 (1943). The equitable result in this case would be to award appellant a share of the joint assets based on proof of her labor and financial contributions to each asset. *Garza v. Fernandez*, supra; see *Cross v. Cross*, 94 Ariz. 28, 381 P.2d 573 (1963). However, throughout the entire history of these proceedings, appellant's counsel has continually and persistently argued that appellant was entitled to a 50 per cent interest in the jointly held property. At several points either during trial or in post-trial memoranda, appellant specifically refutes the contribution theory as a basis for recovery. Since appellant's counsel steadfastly relies on this interpretation of the law as the sole basis for his client's relief, we affirm the trial court's decision on two grounds. First, there is evidence that the parties intended to share the joint assets equally because they intended to eventually marry. Since they never got married, this contingency of their agreement never occurred. Second, we reject the notion that the agreement stood independently of the cohabitation arrangement. The commingling of funds and the concurrent agree-

ment to share them equally would never have existed but for the relationship. See *Stevens v. Anderson,* 75 Ariz. 331, 256 P.2d 712 (1953).

Affirmed.

BIRDSALL, C.J., and HOWARD, J., concur.