T.C. Memo. 1999-62


UNITED STATES TAX COURT


VIOLET A. REYNOLDS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5708-97.                    Filed March 4, 1999.

        P and H cohabited for 24 years, H earning the
income and P primarily taking care of the household.
After H terminated the relationship, H sued P for
ejectment, trespass, and conversion, praying in his
complaint mainly for a judgment stating that P had no
interest in property that was purchased during their
relationship.  P, in her answer, alleged that she had
an equitable interest in the property.  H, in
settlement of the lawsuit, generally agreed to pay P
$153,500 to perfect his sole ownership of all the
property.  R determined that the portion of the
settlement that P received during the subject year was
paid to her as compensation for the homemaking services
that she provided during the relationship.
        <u>Held</u>:  H paid P the disputed amount in
satisfaction of her interest in the property, an
interest that she had received as a gift from H during
their relationship.  Because P's basis in the property
is greater than the settlement amount, none of the
disputed amount is income to her.

Paul Eugene Groff, for petitioner.

J. Scott Hargis and Joyce Marr, for respondent.


MEMORANDUM OPINION

LARO, Judge:  This case is before the Court fully
stipulated.  See Rule 122.  Violet A. Reynolds petitioned the
Court to redetermine respondent's determination of a $5,805
deficiency in her 1994 Federal income tax and an $1,161
accuracy-related penalty under section 6662(a).  The principal
issue we decide is whether payments received by petitioner under
a settlement agreement are includable in her gross income.  We
hold they are not.[1]  Unless otherwise stated, section references
are to the Internal Revenue Code in effect for the subject year.
Rule references are to the Tax Court Rules of Practice and
Procedure.

Background[2]

Petitioner and Gregg P. Kent (Mr. Kent) were involved in a
close personal relationship from 1967 until 1991, and they
cohabited as an unmarried couple during the last 24 years of the
relationship.  Mr. Kent told petitioner early in the relationship

_____

[1] The only other issue in dispute is the applicability of
the accuracy-related penalty.  Our holding on the principal issue
renders this other issue moot.

[2] The parties have stipulated all facts.  The stipulation of
facts and the exhibits submitted therewith are incorporated
herein by this reference.  When the petition was filed,
petitioner resided in Seal Beach, California.

that she should not work and that he would provide for her financially. Petitioner generally was not employed during the relationship. She took care of the house and grounds in and on which she and Mr. Kent lived, and she took care of a boat that was acquired during their 25 years together. She also acted as hostess for their parties and as Mr. Kent's nurse when he was ill. Her relationship with Mr. Kent resembled that of a husband and wife, including, but not limited to, the sharing of affection and the presence of sexual relations.

Several items of real and personal property were purchased during their relationship. Each item was placed in the name of Mr. Kent or in the name of KENCOR, a California corporation in which Mr. Kent was the majority shareholder. The property included a house, an automobile, furniture, and boats. The house was purchased in 1980, and, following the purchase, Mr. Kent and petitioner lived there for the next 11 years.

Mr. Kent purchased clothing and jewelry for petitioner and gave her a weekly allowance. When Mr. Kent and petitioner traveled together, they would hold themselves out as husband and wife.

In July 1991, Mr. Kent moved out of the house and broke off the relationship. He asked petitioner to leave the house and return the vehicle she was driving (a 1987 Lincoln Town Car), which was in the name of KENCOR. Petitioner refused, and Mr. Kent and KENCOR (collectively, the plaintiffs) sued petitioner for ejectment, trespass, and conversion (the lawsuit). The

plaintiffs prayed mainly for a judgment stating that petitioner had no interest in the property that was purchased during their relationship.  Petitioner, in answering the plaintiffs' claim, asserted as a "First Affirmative Defense" that she had an equitable interest in the property.  She stated in a "Declaration" filed in the lawsuit:

2.  I met Mr. Gregg P. Kent in 1957.  At that time each of us was married.  I was working with my husband in his construction business and Mr. Kent had jobs on which we wanted to bid.  For the ten year period between 1957 and 1967, I saw him periodically in connection with his dealings with my husband.

3.  In 1967, Mr. Kent and I had an affair that lasted for approximately a year.  In 1968 Mr. Kent rented an apartment in Kent, Washington.  He asked me to leave my husband and move in with him.  At that time, we discussed getting married but, as I indicated, we were both already married.  In connection with our discussions of marriage, Mr. Kent told me:  "As my wife, Violet, you would not have to work.  I am the provider, I do that job."  He told me that my role in our relationship would be to provide for his needs, be the hostess and social director, and take care of the home.  Relying on that agreement, I left my husband and moved into Mr. Kent's apartment in Kent, Washington with him some time in 1968. * * *

4.  In 1970, Mr. Kent moved back to Southern California and approximately four to six months later, I joined him in Downey, California.  We lived together in Downey at the Stonewood Apartments between 1970 and 1972.  In 1973 we moved to the Oak Hills Apartment in Montebello, California * * *.  We lived together there until 1974.  In 1974 we moved to * * * El Monte, California.  We lived there in 1974 and 1975.  In 1975 we moved to * * * Huntington Beach, California, and lived there from 1975 to 1980.  In 1980, we purchased the property in which I presently reside * * *.

7.  * * *  At the time we purchased the home, he and I went looking for new homes.  He told me that things were going well in the business, he wanted a new home for us and wanted me to pick out our home.  He and I looked at a number of houses and selected our present

home. At the time the residence was purchased, he told me it would be my home, and it was our home.

*     *     *     *     *     *     *

11. * * * in approximately 1989, Mr. Kent acquired a new Mercedes for his personal use. At that time, he told me that he was giving me the 1987 Lincoln Town Car for my car and that car would be mine. * * *

12. From the time Mr. Kent and I moved in together to the present, he has provided for all of the needs of each of us in accordance with our prior agreement. Specifically, Mr. Kent provided everything that was needed by us to live. Mr. Kent, during the last several years, would give me between $500-$600 a week, which money was to be used by me for the normal household expenses, plus personal expenditures (hair, nails, etc.), except that approximately once a month we would go to the store together to buy major items for cleaning and household purposes. Usually at those times we would spend between $500-$600.

*     *     *     *     *     *     *

16. In 1987, when we purchased the present boat, Mr. Kent told me he wanted us to get a bigger and better boat so that we could do more entertaining on board. At the time the boat was purchased, Mr. Kent said that the boat was ours. On many occasions he referred to it as "our boat" which I took to mean that I had an equal interest in the boat. I believe the boat's purchase price was approximately $260,000.00. Since then Mr. Kent has spent at least another $100,000.00 in upgrades on it. He told me that the reason he paid so little for it was that he was able to buy it for us at cost.

17. In 1970 when we moved in together, Mr. Kent told me that his wife had asked him to leave and that he wanted to move ahead with his life and wanted me to be part of that life. Each of us was married at that time. He told me that he and his wife were discussing a divorce and that when his divorce situation was settled, we would then talk about getting married. Subsequently, my divorce became final in 1974 and Mr. Kent's divorce became final in 1978. At that time, we discussed getting married; however, Mr. Kent told me: "Why should you worry? Look at all the things we have acquired together. It isn't necessary to be married. Why should you worry? I will continue to take care of

you just like I have taken care of you in the past." I relied upon those statements and never insisted on us getting married * * *.

    \*       \*       \*       \*       \*       \*       \*

21. I have seen financial statements prepared by Mr. Kent where he showed that he owned assets in excess of $18,000,000.00.

    \*       \*       \*       \*       \*       \*       \*

26. In 1968, Mr. Kent and I entered into an agreement whereby he was to be the provider and I was to take care of our nest. That agreement subsequently became more involved and included my taking care of him, the home, the interior of the boat, acting as a hostess for all parties and entertaining he wanted to do for personal and business reasons, doing laundry, housekeeping, ironing, cooking, shopping, supervising the service people who occassionally [sic] worked on the home and acting as nurse for Mr. Kent when he had health problems. In turn Mr. Kent agreed to provide for all of my living expenses * * *. For over 20 years we have lived according to our agreement. * * * Mr. Kent wants to throw me out with nothing to show for the many years we spent together.

In October 1991, the lawsuit was settled, Petitioner and Mr. Kent (both individually and on behalf of KENCOR) signed the Release and Settlement Agreement (settlement agreement). The settlement agreement provided in pertinent part:

WHEREAS, KENT[3] in said case contends that REYNOLDS has no right, title, or interest, or legitimate claim in and to the real and personal property referred to therein, and further, KENT contends REYNOLDS has no right, title, or legitimate claim to any real and/or personal property of KENT, whether alleged in the case or not, and further, that Kent is not liable or responsible for any sums whatsoever; and

WHEREAS, REYNOLDS contends that she has a claim to said real and personal property and to other property, both real

---

[3] KENT in this document refers to both Mr. Kent and KENCOR.

and personal, which may belong to or stand in the name of KENT; and

WHEREAS, each of the parties hereto disputes the other's contentions: and

WHEREAS, the parties, KENT and REYNOLDS desire to resolve their respective differences concerning their respective claims and to memorialize their agreement resolving those differences, and further, forever place the dispute behind them * * *

*    *    *    *    *    *    *

1.   In consideration for the full and complete release by REYNOLDS of any claims of any nature, including but not limited to, any sums of money, and/or claims to any real and/or personal property of KENT, KENT agrees to pay REYNOLDS the following sums, on the following terms:

A.   Cash in the sum of Fifty-seven Thousand Five Hundred Dollars ($57,500), payable after REYNOLDS has delivered all items she has removed from KENT, whether removed from the property * * * or any other items belonging to KENT whether removed from the Subject Property or any other location, and after KENT has verified all items have been returned to the Subject Property * * * and

B.   The sum of Two Thousand Dollars ($2,000) per month for a period of three (3) years payable to the first day of each month commencing November 1, 1991; and

C.   Thereafter, the sum of One Thousand Dollars ($1,000) per month for a period of two (2) years, payable on the first day of each month commencing November 1, 1994 to and including October 1, 1996.

2.   In addition to said sums, KENT will transfer all right, title, and interest in and to the following personal property:

A.   That certain 1987 Lincoln Town Car automobile * * *;

B.   All clothing and jewelry in Reynolds' possession;

C.   * * * miscellaneous household furniture and furnishings * * *.

In accordance with the payment plan set forth in the settlement agreement, petitioner received $22,000 in 1994. This amount was received from KENCOR, and KENCOR issued a Form 1099-MISC, Miscellaneous Income, to petitioner reporting the amount as miscellaneous income. Petitioner did not perform services for KENCOR during that year, nor did she sell it any property during that year. Petitioner, allegedly relying on advice from her attorney and accountant, did not report this amount on her 1994 Federal income tax return.

## Discussion

We must decide whether the $22,000 amount is includable in petitioner's 1994 gross income. Respondent argues it is. Petitioner argues it is not. Respondent contends that petitioner received the disputed amount as compensation for her homemaking services.[4] Petitioner contends that she received the disputed amount as a gift.

We agree with petitioner that the $22,000 amount is not includable in her 1994 gross income, but we do so for a reason slightly different than she espouses. The taxability of proceeds recovered in settlement of a lawsuit rests upon the nature of the claim for which the proceeds were received and the actual basis of recovery. Sager Glove Corp. v. Commissioner, 36 T.C. 1173, 1180 (1961), affd. 311 F.2d 210 (7th Cir. 1962). Ascertaining the nature of the claim is a factual determination that is

---

[4] In this regard, respondent states, petitioner's homemaking services do not include sex.

generally made by reference to the settlement agreement in light of the facts and circumstances surrounding it. Key to this determination is the "intent of the payor" in making the payment. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Agar v. Commissioner, 290 F.2d 283, 284 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960-21; Seay v. Commissioner, 58 T.C. 32, 37 (1972). We must ask ourselves: "In lieu of what was the payment received?" See Robinson v. Commissioner, 102 T.C. 116, 126-127 (1994), affd. in part, revd. in part on an issue not relevant herein and remanded 70 F.3d 34 (5th Cir. 1995). Although the payee's belief is relevant to this inquiry, the payment's ultimate character depends on the payor's dominant reason for making the payment. Commissioner v. Duberstein, 363 U.S. 278, 286 (1960); see Agar v. Commissioner, supra at 298; Fono v. Commissioner, 79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).

The settlement agreement indicates that Mr. Kent paid the disputed amount to petitioner in surrender of her rights in most of the property purchased during their relationship.[5] Respondent agrees with this characterization, but extrapolates therefrom that Mr. Kent paid petitioner the disputed amount to compensate

---

[5] We recognize that KENCOR paid petitioner the $22,000 amount and that KENCOR issued petitioner a Form 1099-MISC reporting that the amount was paid as miscellaneous income. The record, however, tends to disprove such a characterization. The more likely explanation of the payment, and the one we find from the facts herein, is that Mr. Kent, as principal shareholder of KENCOR, caused KENCOR to pay petitioner the $22,000 amount on his behalf.

her for past services that she rendered to him. We do not agree. Nothing in the record persuades us that petitioner ever sought in the lawsuit remuneration for services that she may have rendered to Mr. Kent during their relationship, let alone that Mr. Kent intended to compensate her for any such services by paying her the disputed amount. The written judgment sought by Mr. Kent and the settlement agreement both indicate that the only reason Mr. Kent commenced the lawsuit and paid the disputed amount to petitioner was to retain possession of most of the assets acquired during their relationship.

Although petitioner did refer in her Declaration to an agreement under which she would provide services to Mr. Kent in exchange for support, the facts of this case do not support an inference that she ever sought in the lawsuit to recover remuneration for these services, or, more importantly, that Mr. Kent paid her the disputed amount intending to compensate her for any services that she may have rendered to him.[6] The payor's intent controls the characterization of settlement payments, and, as we have found, Mr. Kent intended to perfect his sole possession of most of their joint property when he paid

---

[6] Even if we were to assume arguendo that Mr. Kent did agree to support petitioner in consideration for her homemaking services, it would not necessarily follow that every item of property that he gave her during their relationship was pursuant to this agreement. In fact, if we were to believe the allegations in petitioner's Declaration to the effect that Mr. Kent spent approximately $32,000 to $38,400 a year on their household and her personal expenses, it would seem most logical to conclude that many of the additional amounts that he gave her were gifts.

petitioner the disputed amount. In this regard, the cases of Green v. Commissioner, T.C. Memo. 1987-503, affd. per curiam 846 F.2d 870 (2d Cir. 1988), Cotnam v. Commissioner, 263 F.2d 119, 122 (5th Cir. 1959), revg. in part and affg. in part 28 T.C. 947 (1957), and Braddock v. United States, 434 F.2d 631 (9th Cir. 1970), are factually distinguishable from the case at hand. The taxpayer in Green, unlike petitioner, sued her partner's estate as a creditor, seeking to recover the value of services that she rendered to him. The same is true with respect to the taxpayer in Cotnam, where the appellate court noted that "The pleadings in the * * * [State court] proceedings show clearly that Mrs. Cotnam's claim was based on the theory of a contract for services." As to Braddock, the payor there, unlike the payor here, had a legal obligation to pay the taxpayer for her services in cooking, cleaning, and helping him with his farm.

Our conclusion that Mr. Kent paid petitioner the disputed amount for her interest in the property does not end our inquiry. Petitioner's sale of her property interest to Mr. Kent is a taxable event for which she must recognize gain to the extent that the selling price exceeds her basis in the property. Sec. 1001(a). As to her basis, the record indicates that petitioner received her interest in the property by way of numerous gifts that Mr. Kent made to her throughout their relationship. Petitioner's declaration depicts a setting under which Mr. Kent repeatedly "gave" her property, and the facts of this case support the conclusion that he made these "gifts" with the

"detached and disinterested generosity, * * * affection, respect, admiration, charity, or the like" required by Commissioner v. Duberstein, supra at 285.[7] Given the fact that petitioner and Mr. Kent for a long period of time lived as husband and wife in most regards, but for the obvious fact that they were not legally married, we find it hard to believe that their relationship was actually akin to a business arrangement.[8]

Our conclusion herein that the property received by petitioner from Mr. Kent was by way of a gift, rather than as compensation for her services, is consistent with prior decisions of this Court. First, in Starks v. Commissioner, T.C. Memo. 1966-134, the taxpayer, a young unmarried, nonworking woman was involved with a much older man. The man, in return for the woman's companionship, gave her money to buy a house and to spend on her living expenses. He also gave her an automobile, jewelry,

---

[7] In reaching this conclusion, we bear in mind the allegations set forth in petitioner's Declaration. We do not, however, accept all these allegations as true.

[8] We are mindful that all property acquired during the relationship was placed in the name of Mr. Kent or that of a corporation that he controlled. We do not find this fact to negate the presence of a gift under the facts herein. Federal law answers the question of whether a gift has occurred for Federal income tax purposes, Commissioner v. Duberstein, 363 U.S. 278, 286 (1960), and we believe that Mr. Kent's requested judgment and the settlement agreement speak loudly to the effect that he gave petitioner interests in property under the test set forth in Duberstein. To the extent that State law is relevant to this inquiry, applicable State (California) law does provide that a nonmarital partner may have an equitable interest in property titled solely in the other partner's name. See Marvin v. Marvin, 18 Cal.3d 660, 684 n.24, 557 P.2d 106 (1976), and the cases cited therein at 669-670.

furniture, fur coats, and other clothing. Respondent determined
that the money and other assets were taxable to the woman as
compensation for services rendered to the man. We disagreed. We
held that the woman received the money and other assets as gifts.
See also Libby v. Commissioner, T.C. Memo. 1969-184 (similar
holding as to cash and property given to a young mistress by her
older paramour).

Later, in Pascarelli v. Commissioner, 55 T.C. 1082,
1090-1091 (1971), affd. without published opinion 485 F.2d 681
(3d Cir. 1973), we held to the same effect. There, the taxpayer
was a woman who lived with a man who was not her husband. The
man gave money to the woman in exchange for "wifely services".
Respondent determined that the money was taxable to the woman as
compensation that she earned for her services. We disagreed. We
held that the payments were gifts. We found that the man paid
the money to the woman "motivated by sentiments of affection,
respect, and admiration". Id. at 1091.

And later, in Reis v. Commissioner, T.C. Memo. 1974-287, the
taxpayer was a young female nightclub dancer who met an older man
when he bought dinner and champagne for the performers in the
show. The man paid each person at the table, other than the
woman, $50 to leave the table so that he and she would be alone.
The man gave the woman $1,200 for a mink stole and another $1,200
so that her sister could have an expensive coat too. Over the
next 5 years, the woman saw the man "every Tuesday night at the
[nightclub] and Wednesday afternoons from approximately 1:00 p.m.

to 3:00 p.m. * * * at various places including * * * a girl friend's apartment and hotels where [he] was staying."  He paid her living expenses, plus $200 a week, and he provided her with money for other things, such as investing, decorating her apartment, and buying a car.  We held that none of the more than $100,000 that he gave her over the 5 years was taxable to her. We concluded that she received the money as a gift.  We reached this conclusion notwithstanding the fact that the woman had stated that she "earned every penny" of the money.

Given our conclusion in this case that petitioner received her interest in the property as gifts from Mr. Kent, her basis in the property equals Mr. Kent's basis immediately before the gifts, to the extent that his basis is attributable to the gifted property.[9]  Sec. 1015(a).  Although the record does not indicate with mathematical specificity the amount of Mr. Kent's basis that passed to petitioner as a result of the gifts, we are satisfied from the facts at hand that her basis equaled or exceeded the amount that she realized on the sale; i.e., $153,500.[10]  We conclude that petitioner had no gain to recognize upon receipt of the disputed payment.

---

[9]If petitioner were claiming (which she is not) that she had realized a loss on her disposition of any of the gifted property, her basis in that property would equal the lesser of Mr. Kent's basis at the time of the gift or the property's fair market value at that time.  Sec. 1015(a).

[10]In fact, we do not think it unreasonable to conclude that petitioner's basis in the house and boat equaled or exceeded $153,500.

We have carefully considered all arguments by respondent for a contrary holding, and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.