Filed 3/28/25  McCullagh v. Kiosef CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ROBIN MCCULLAGH,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CHRIS KIOSEF et al.,<br><br>  Defendants and Appellants | F086616<br><br>(Super. Ct. Nos. BCV-16-101459,<br>BCV-19-101498)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Law Offices of Randall S. Waier and Randall S. Waier for Defendants and Appellants.

Young Wooldridge and Brett A. Stroud for Plaintiff and Respondent.

-ooOoo-

After the end of the long-term nonmarital relationship between Robin McCullagh and Chris Kiosef, McCullagh filed an action alleging breach of an implied contract, breach of an oral contract for joint venture, and quantum meruit for compensation for the value of services rendered during the relationship.  The trial's first phase ended with the

jury completing a special verdict form and finding (1) the parties had not entered into an oral contract; (2) the parties had formed an implied contract; and (3) Kiosef did not breach the implied contract—that is, he did not "do something that the contract prohibited him from doing." In subsequent proceedings, the trial court determined (1) the jury had found the implied contract was one to form a bee business as a general partnership in which each party had a 50 percent interest; (2) McCullagh was entitled to over $350,000 as her share of the business's net profits; and (3) the partnership remained in effect notwithstanding the termination of the parties' nonmarital relationship.

On appeal, Kiosef contends the trial court erred in determining the implied contract was an agreement to form a business partnership. Based on our independent review of the pleadings, evidence, jury instructions, counsels' arguments to the jury, and the jury's questions, we conclude the trial court did not err in interpreting the special verdict or otherwise commit reversible error.

We therefore affirm the judgment.

## FACTS

Kiosef and McCullagh met in 1999. For most of the time from 2001 to 2015, they lived together in a nonmarital relationship and had four children together. McCullagh alleged that she left their residence in 2015 out of fear due to repeated and continuous verbal, physical and mental abuse.

In August 2001, a fictitious business name statement for King Bee Apiarys was filed with the Kern County auditor-controller-county clerk. Kiosef was the only owner listed. The parties dispute which of them came up with the name. McCullagh testified they were talking about giving the business a name, he suggested Chris's bees, she said that there was one queen bee that runs the worker bees and he could be the king bee, and Kiosef kind of laughed. Then she said, "No really. You be King Bee, King Bee Apiarys" and he agreed. Lucas Martin, a man who worked for Kiosef for about eight months in

2.

2015 to 2016, testified Kiosef told him that McCullagh "helped come up with the name for the business and he liked it and he went with that name."

Although Kiosef may have acquired bees earlier, the start of the bee pollination business in 2001 is supported by Kiosef's federal income tax returns for 1999 and 2000, which reported no income or expenses for a bee business. Schedule C of his 2001 federal income tax return stated Kiosef was the proprietor of King Bee Apiarys and reported the business had no sales and a net loss of $4,650 for that year.

In Kiosef's view, he operated and managed the bee business, he was its sole owner, and he was individually responsible for the business's debts and liabilities from the beginning. He contends McCullagh's primary role during their relationship was tending to their children and household. Kiosef asserts the fact that the business was a sole proprietorship is reflected in the renewals of the fictitious business name that McCullagh helped prepare and reviewed for accuracy. Kiosef testified McCullagh was never listed as an owner on the business liability insurance and worker's compensation insurance policies he obtained for the bee business.

The person who provided income tax and bookkeeping services to Kiosef and McCullagh from 2005 through 2012 testified King Bee Apiarys was a sole proprietorship in Kiosef's name; she taught McCullagh to do bookkeeping to track the business's income, expenses and payroll; she would deal with McCullagh throughout the year on payroll and bookkeeping issues; and she would see Kiosef at tax appointments. McCullagh testified that Kiosef was the only authorized signer on the checking account kept in King Bee Apiary's name, she normally would write the checks and make an entry in the ledger, and Kiosef would sign them.

In McCullagh's view, she and Kiosef entered into a contract in which they agreed to be partners in the business. McCullagh testified that Kiosef told her the business "was for our future. This was our family business and we had to put everything we had into it, you know, for the betterment of us and for the family and everybody — all of us involved

3.

little to big." When asked if she had any concerns about her name not being on the renewal of the fictitious business name statement, McCullagh testified: "I trusted that [Kiosef] was the head of our family business and he was on there and that was fine with me. I wasn't concerned about it."

The parties do not dispute that their romantic relationship ended before May 2015. Issues involving the children were litigated in a family court proceeding. For example, in 2015, the parties filed a stipulation in that proceeding addressing custody, visitation and the exchange of the children.

## PROCEEDINGS

In June 2016, McCullagh filed a complaint for breach of express contract, breach of implied contract, quantum meruit, breach of oral agreement for joint venture, partition, and declaratory relief. Kiosef's answer contained a general denial and a dozen affirmative defenses, one of which asserted "McCullagh's Complaint is barred by the applicable statute of limitations to bring a cause of action for either a written or oral agreement." The answer did not allege the breach of *implied* contract cause of action was barred by the statute of limitations and did not specify the code section of the statute he contended was applicable. (See Code Civ. Proc., § 458; *Area 55, LLC v. Nicholas & Tomasevic, LLP* (2021) 61 Cal.App.5th 136, 172–173 [forfeiture of statute of limitations defense].)

### Phase One Jury Trial

In October 2017, the parties stipulated to bifurcation of "the issues of breach of contract and damages, such that the existence of a contract issue will first be fully resolved through trial or to a jury. Once the breach of contract issue is final, the parties agree to a ninety-day discovery period … related to damage and property value evaluations." The parties further stipulated that, after the discovery period concluded, "the damages and breach of contract issues will be tried to a new jury." The parties stated they made the stipulation because whether a contract existed was a vigorously contested

4.

issue and they wished to avoid spending significant amounts on economists, appraisal experts, and damages discovery if those expenses were not necessary.

In December 2018, the first phase of the bifurcated trial began. On the sixth day of the jury trial, McCullagh presented her rebuttal evidence and rested. The next day, the trial court instructed the jury on the three claims presented and the attorneys made their closing arguments.

The jury instructions included Instruction 300, "Breach of Contract—Introduction," that began by stating McCullagh claimed she and Kiosef "entered into a contract to become partners in a bee business." The instruction was proposed by Kiosef's counsel and was agreed to by McCullagh's counsel. The instruction's second sentence stated McCullagh claimed Kiosef "breached this contract by (i) taking all the assets and profits to the exclusion of Ms. McCullagh, (ii) purchasing real property in his name alone, and (iii) misdirecting profits of the joint business." Instruction 302 set forth the essential elements of contract formation and Instruction 303 identified the elements McCullagh needed to prove to establish liability for a breach of contract.

The jury also was given an instruction based on CACI No. 305 on how implied-in-fact contracts are created and a special instruction setting forth 10 factors that, by themselves, did not show an implied contract, but could be considered in deciding whether there was an implied contract. These factors were taken from case law discussing agreements between unmarried cohabitants. (See *Marvin v. Marvin* (1976) 18 Cal.3d 660 (*Marvin*); *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 456–457; *Alderson v. Alderson* (1986) 180 Cal.App.3d 450, 461.)

No instructions explained what a partnership was or how one was formed, but instruction No. 3712 addressed joint ventures[1] by stating: "You must decide whether a joint venture was created in this case. A joint venture exists if all of the following have been proved: [¶] 1. Two or more persons or business entities combine their property, skill, or knowledge with the intent to carry out a single business undertaking; [¶] 2. Each has an ownership interest in the business; [¶] 3. They have joint control over the business, even if they delegate control; and [¶] 4. They agree to share the profits and losses of the business." The instruction also stated a joint venture could be formed by a written, oral or implied agreement.

Near the beginning of his argument McCullagh's counsel described the three claims addressed by the special verdict form and stated the breach of an implied contract was "sort of the heart of the case." Counsel asserted "McCullagh did a heck of a lot of work for the bee business" over the years and did not get paid. He argued McCullagh was a partner in the family business and not an employee because she was never given a W-2 form, no payroll deductions were taken from the checks she received, and, in any event, the checks were for groceries, bills and other household expenses, not wages. Counsel also referred to McCullagh's testimony and argued "Kiosef constantly call[ed] it 'Our business. Family business' " and also told McCullagh that when they got older and could not do the physical labor required by the bee business, the properties purchased would provide for their retirement.

After summarizing the evidence and certain jury instructions, McCullagh's counsel went through the special verdict form question-by-question. He asserted the first

---

**1** Although the instructions refer to "partners in a bee business" and "joint venture," the distinction between a partnership and a joint venture is immaterial to the issues presented in this appeal. "From a legal standpoint, both relationships are virtually the same." (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 482; *Mashon v. Haddock* (1961) 190 Cal.App.2d 151, 165–166 [rights and liabilities of joint venturers as between themselves are generally the same as those of partners].)

question about the formation of an implied contract and the second question about McCullagh doing all the things the contract required of her should be answered "yes." He then stated: "And then you also have to find that Mr. Kiosef failed to do something the contract required him to do. Well, that would be to give her an ownership interest in the business. So that's where he failed to do something from our p[er]spective." Restating this point, he said: "Did Mr. Kiosef do something the contract prohibited him from doing? Yes. He did not share in the business with her when she left."

Addressing the next theory of relief, which began with Question No. 4 of the special verdict, McCullagh's counsel stated: "And then we go to the joint venture claim, which is entirely separate and you answer this question no matter what your other answers are." Counsel asked the jury to answer "yes" to whether the parties entered into an oral argument for a joint venture. As to the third claim, counsel stated it was called quantum meruit and was "just for the value of services performed."

After beginning its deliberations, the jury sent the court a question asking to "have the legal definition of what a family business is." The answer proposed by the trial court and approved by counsel stated there was no legal definition of family business and the words were to be applied using their ordinary everyday meanings.

The next day, December 13, 2018, the jury asked for a clarification of Question No. 3 on the special verdict form, which asked: "Did … Kiosef do something the [implied] contract prohibited him from doing?" The trial court proposed telling the jury: " 'See Instruction 303 subparagraphs 3 and 3-A. Did Chris Kiosef fail to do something that the contract required him to do or did Chris Kiosef do something that the contract prohibited him from doing?' " Counsel agreed.

Later that day, the jury completed its deliberations and answered the questions in special verdict form. The jury found the parties had not entered an oral contract, had entered an implied contract and, answering Question No. 3, found Kiosef had not done something the implied contract prohibited him from doing. Answering questions

7.

addressing McCullagh's quantum meruit claim, the jury found (1) Kiosef requested, by words or conduct, that McCullagh perform services for his benefit, (2) McCullagh performed the requested services, and (3) Kiosef did not pay McCullagh for all the services she provided. It also found in favor of McCullagh on the question addressing Kiosef's statute of limitations defense. The jury was polled only as to Question No. 3, and the jurors confirmed the answer. Neither side requested a clarification of any aspect of the special verdict before the jury was discharged.

*Proceedings Before Trial's Phase Two*

In March 2019, Kiosef filed a motion asserting the damages phase of the trial should be limited to what, if anything, was owed McCullagh on her quantum meruit claim. Kiosef argued the jury found he did not breach the implied-in-fact contract and, therefore, no damages could be awarded on that cause of action.

McCullagh's opposition argued Kiosef's motion was a "disguised motion for summary judgment, for the partial rendering of a judgment based on some but not all the jury findings, or for some other type of interpretation of the jury verdict." McCullagh interpreted the special verdict and jury instructions to mean "the jury was required to make a finding as to what type of agreement was entered into [by] the parties. The jury could determine either that [they] agreed to become partners in a bee business, or they did not." McCullagh argued the jury found they entered into a contract, "and that contract, according to CACI 300, was to be partners in the bee business." McCullagh stated Kiosef had not requested more specific instructions relating to partnership and should not be heard to complain about the lack of more specific instructions.

McCullagh addressed the jury's finding of no breach by arguing there were two possible interpretations, one of which was "that the jury found there was no breach—yet." In support of this interpretation, McCullagh asserted the jury had not been told of any specific demands by her to divide the proceeds of the partnership and, because the issue of damages was deferred, there was no evidence that the jury was aware of whether

8.

Kiosef had taken more than what belonged to him. McCullagh argued that, with no evidence the bee business was profitable or Kiosef rejected a specific demand by her, the jury "could easily have found that there simply was no breach of contract to form a bee business" even though they agreed to create (and did create) a bee business. Summarizing her position, McCullagh acknowledged the jury found no breach of contract had occurred, but stated the no-breach finding was not necessarily inconsistent with the finding an implied contract to form a partnership existed because the jury "may have simply decided that there had been no breach to date."

In reply, Kiosef argued McCullagh was really asking the trial court to speculate by making "an implied finding that a partnership was formed" and to expand the second phase to include breach of the purported partnership agreement and any resulting damages. Kiosef also argued that regardless of what kind of implied contract the jury found was formed, because there was no breach of that contract, the issue of breach was not appropriate for the second phase addressing damages. Referring to the stipulation's purpose, Kiosef asked the court to limit discovery on contractual damages because the contractual claims had been fully resolved by the jury's findings.

The trial court denied Kiosef's motion without prejudice.

*The 2019 Lawsuit*

In May 2019, McCullagh initiated a new lawsuit by filing complaint for (1) partnership dissolution, (2) accounting, (3) declaratory relief, and (4) appointment of a receiver or injunctive relief. McCullagh amended the complaint in July 2019 and December 2019, retaining the same causes of action. For purposes of this appeal, the operative pleading in the 2019 lawsuit is the second amended complaint. Its prayer for relief requested (1) the partnership be dissolved, (2) the partnership property be sold, its debts paid and the surplus divided between the parties, (3) an account be taken of all dealing of the partnership since its commencement and all money received by and paid to McCullagh and Kiosef, respectively, with McCullagh having judgment against Kiosef for

9.

all sums found owing to her, (4) a declaration of the rights and obligations of the parties, including "the percentage of partnership interest of each of the parties," and (5) a receiver be appointed to take possession of all partnership property and assets and wind up its affairs. The trial court consolidated the 2016 lawsuit with the 2019 lawsuit.

The parties filed cross-motions for summary adjudication addressing the newly pleaded causes of action. McCullagh asserted the jury found the parties formed a contract to start a bee business, she and Kiosef each had a 50 percent share of the partnership, and the partnership still continued as an entity. Kiosef argued the partnership claims were barred by the statute of limitations, the jury had not found there was a partnership, and, regardless of the kind of implied contract formed, the jury found there was no breach and, thus, there were no damages for breach of an implied contract.

In September 2020, the trial court issued a ruling on the cross-motions for summary adjudication. After considering the "contents of the court file and the record, including… the pleadings, Court minute orders, jury instructions, closing arguments of counsel, the jury instructions conference between Court and counsel at which the language of the jury instructions was finalized and agreed upon," the court concluded (1) the jury found the parties had entered into an implied partnership contract to jointly own the business; (2) McCullagh properly raised the issue that the implied-in-fact contract was one to form a partnership; (3) the partnership formed was a general partnership; and (4) the partnership did not terminate when the parties permanently separated.

*Phase Two Court Trial*

In December 2022, the second phase of the trial began. McCullagh orally moved to dismiss her causes of action for dissolution of the partnership, declaratory relief, and appointment of a receiver or injunctive relief. The trial court granted the dismissal of the declaratory relief and receivership claims and set the dismissal of the dissolution of partnership for argument. Less than a week later, McCullagh filed a written request for dismissal with prejudice of the partnership dissolution cause of action, which the clerk of

10.

court entered. As a result, McCullagh's cause of action labeled "accounting" was the only cause of action tried to the court.

After hearing the testimony, the trial court set a schedule for posttrial briefs and stated the matter would stand submitted after McCullagh's rebuttal brief was filed. In March 2023, the court issued a tentative decision. The court stated the jury verdict determined that, pursuant to an implied agreement, McCullagh was and continues to be a 50 percent partner with Kiosef in the business known as King Bee Apiarys and the verdict did not limit McCullagh's right to an accounting of partnership profits. The court also stated a money judgment for McCullagh's share of the net income for the years in question was an available remedy. The court found McCullagh had a $356,645 interest in the net profits and confirmed her status as a 50 percent partner in the business.

*Judgment and Appeal*

In April 2023, the trial court entered a "COURT JUDGMENT" in favor of McCullagh and against Kiosef in accordance with its tentative decision. On June 1, 2023, the trial court signed and filed a "Final Judgment Disposing of All Issues" that incorporated the December 2018 jury verdict, the court's September 2020 findings and ruling, and the "provisional" judgment entered in April 2023. Kiosef filed a timely appeal.

## DISCUSSION

Kiosef contends the core issues in this appeal are (1) whether there was an agreement between McCullagh and himself to form a business joint venture and (2) whether he breached that agreement. Kiosef argues the jury's finding that an implied contract existed did not specify the form or nature of the contract and, therefore, it was legal error for the trial court to interpret the finding against him and conclude the jury found the parties had entered into an implied partnership agreement. McCullagh agrees that an issue on appeal is whether the trial court correctly interpreted the special verdict as finding she and Kiosef were general partners in the bee business.

11.

Based on the parties' contentions, our analysis begins with the principles of law governing special verdicts and then addresses whether the trial court erred in interpreting the special verdict. Based on our independent review of the record, we join the trial court in concluding the implied contract the jury found existed was a contract to be partners in the bee business.

## I.      BASIC LEGAL PRINCIPLES

### A.      Special Verdicts

A jury's verdict "is either general or special." (Code Civ. Proc., § 624.)[2] In a general verdict, the jury "pronounce[s] generally upon all or any of the issues, either in favor of the plaintiff or defendant." (*Ibid.*) In comparison, a "special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be presented so that nothing shall remain to the Court but to draw from them conclusions of law." (*Ibid.*) In other words, the questions in a special verdict are not supposed to address evidentiary facts or conclusions of law. (7 Witkin, Cal. Procedure, *supra*, Trial, § 347, p. 298.) "Thus, in a special verdict, express findings are made on each ultimate fact essential to the claim; in a general verdict, findings on all issues are implied." (7 Witkin, Cal. Procedure, *supra*, Trial, § 346, p. 297.)

---

[2]     Despite the statute's use of either-or, when a general verdict is used, a trial court has the discretionary authority to direct the jury to make findings upon particular written questions of fact. (Code Civ. Proc., § 625.) This combination or hybrid is referred to as "a general verdict with special findings." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358 (*Singh*).) The questions of fact are referred to as special interrogatories. (E.g., *Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1152.) "Where a special finding of facts is inconsistent with the general verdict," the special finding controls. (Code Civ. Proc., § 625.) "The purpose of special interrogatories is to test the validity of the general verdict." (7 Witkin, Cal. Procedure (6th ed. 2021) Trial, § 351, p. 302.)

A variety of problems can arise when a special verdict is used. (See e.g., *Singh*, *supra*, 186 Cal.App.4th at p. 349, fn. 6 ["we find several of these special verdicts very problematic"].) Sometimes, these problems or deficiencies are interrelated. Also, the statutory requirement that the jury resolve every controverted issue when rendering a special verdict means certain types of deficiencies cannot be remedied by the trial or appellate court. (See *Trejo v. Johnson & Johnson* (2017) 13 Cal.App.5th 110, 141 [pitfalls of special verdicts].)

### 1. An Incomplete Special Verdict

A special verdict is incomplete when it omits a finding necessary to support a judgment on the cause of action. For example, in *Pinto v. Farmers Insurance Exchange* (2021) 61 Cal.App.5th 676, the appellate court concluded the special verdict was facially deficient because it included no finding that the insurance company acted unreasonably in declining a settlement offer. (*Id.* at p. 689.) The court referred to the rule that a plaintiff bears the responsibility for a special verdict submitted to the jury on his own case, reviewed the circumstances of the case, and then concluded the appropriate remedy was to vacate the judgment based on the insurance company's bad faith and enter a new judgment for the insurance company. (*Id.* at pp. 693, 694; see *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 326 [element of a battery claim missing from special verdict]; *Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 962 [incompleteness of special verdict resulted in award of punitive damages being struck].)

Here, neither party contends the special verdict was incomplete because it omitted a finding on a necessary element of McCullagh's breach of contract causes of action.

### 2. Inconsistent Special Verdict

Another problem with special verdicts is inconsistency, which occurs when the findings contradict one another on a material issue. (*Singh*, *supra*, 186 Cal.App.4th at pp.

13.

357, 358.) This defect arises when "there is no possibility of reconciling" the special verdict's findings with each other. (*Id*. at p. 357.) Where the special verdict's findings are contradictory on material issues and the correct determination of those issues is necessary to reach a judgment, the inconsistency is a reversible error and the proper remedy is a new trial. (*Id*. at p. 358.) In other words, courts are not permitted to choose between the jury's inconsistent answers. (*Ibid*.)

The "no possibility of reconciling" test leads to the subject of ambiguous special verdicts. Sometimes ambiguities can be interpreted in a way that make the jury's findings consistent. For instance, when an ambiguity creates a *potential* conflict, "if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424, disagreed with on another ground by *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 982–983.)

### 3. An Ambiguous Special Verdict

Two categories of ambiguity in special verdicts are recognized by the case law—merely ambiguous and hopelessly ambiguous. When a special "verdict is hopelessly ambiguous, a reversal is required." (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 457 (*Woodcock*).) If the special verdict is " 'merely ambiguous,' " courts will either interpret the ambiguity or conclude it was forfeited. (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 299.) A party's failure to seek a clarification before the jury is discharge may operate as a forfeiture of the purported defect on appeal. (*Ibid*.) If no forfeiture occurred, a court interprets the special verdict's ambiguity in light of the pleadings, evidence, instructions, and counsel's argument to the jury. (*Id*. at pp. 299–300; *Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038 (*Fuller*).) In such a situation, the special verdict should be interpreted, if possible, to

14.

uphold it, give it the effect intended by the jury, and make it consistent with the law and the evidence. (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223.)

Generally, the forfeiture rule applies to apparent defects in a special verdict. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 265.) Thus, a party may lose the right to object or seek the clarification of a defect by not asserting the right in a timely manner. The purpose of the rule is to encourage parties to bring defects to the attention of the trial court before the jury is discharged so the jury can resolve the ambiguity or defect. (*Ibid*.) The failure to object to the form of a verdict before the jury is discharged does not automatically result in a forfeiture because there are many exceptions to the general rule of forfeiture. (*Id*. at p. 269.)

In *Woodcock, supra,* 69 Cal.2d 452, the Supreme Court recognized an exception to the forfeiture or waiver rule "where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' " (*Id*. at p. 456, fn. 2.) In *Woodcock*, the question was whether the $13,000 in damages awarded by the jury represented all the plaintiff's damages or, alternatively, reflected an offset by the jury for the workers' compensation benefits received by the plaintiff. (*Id*. at pp. 457–459.) The court concluded that, in light of the instructions, the verdict was not ambiguous because it represented the entirety of the plaintiff's damages and, even if it was ambiguous, there was no waiver or forfeiture because there was "no hint of a purpose to achieve a 'technical advantage' or fulfill a 'litigious strategy,' and defendant should not be estopped to make his objections." (*Id*. at p. 457, fn. 2.)

### 4. Lack of Specificity in a Special Verdict

Another problem with special verdicts is that its questions might not separately address each theory argued to the jury. For example, in *Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20 (*Jonkey*), the plaintiff was injured at a construction site when he was struck in the foot by a falling plank from a scaffold being disassembled by a

15.

subcontractor on the project. The plaintiff argued the subcontractor was negligent in two ways—use of an unreasonable method to disassemble the scaffold and inadequate warning procedures. (*Id*. at p. 25.) The jury found the subcontractor was negligent but that its negligence was not a substantial factor in causing harm to the plaintiff. (*Id*. at p. 24.) The verdict did not specify the way in which the defendant was negligent. (*Ibid*.) The trial court entered judgment in favor of the subcontractor.

On appeal, the plaintiff in *Jonkey* argued, in effect, that the general finding of negligence in those circumstances required the jury, as a matter of law, to find causation. (*Jonkey*, *supra*, 139 Cal.App.4th at p. 24.) The appellate court rejected this argument, stating: "Where, as here, there is no special finding on what negligence is found by the jury, the jury's finding is tantamount to a general verdict. As long as a single theory of negligence is lawfully rebutted on a lack of causation theory, it matters not that another theory of negligence is not so rebutted." (*Id*. at p. 26.) In *Jonkey*, the court concluded the single theory of negligence rebutted by a lack of causation was the failure to warn. Thus, the court drew inferences in favor of the verdict and concluded the jury found (1) the subcontractor's only negligence was the failure to warn and (2) that negligence was not a substantial factor in causing the plaintiff's injury. (*Id*. at p. 25.) As a result, the judgment in favor of the subcontractor was affirmed. (*Id*. at p. 22.)

B.      Standard of Review

Kiosef contends this court should conduct a de novo review of his challenge to the trial court's interpretation of the jury's finding in the special verdict. (See *Singh, supra,* 186 Cal.App.4th at p. 357 [determination of whether special verdict's findings are inconsistent is subject to de novo review].) McCullagh asserts: "The trial court's interpretation of a special verdict is reviewed de novo. (See *Woodcock*[, *supra*,] 69 Cal.2d 452, 457.)" We conclude the trial court's determinations involving the special verdict, whether characterized as interpretation or otherwise, are subject to independent

16.

review by this court. Consequently, the trial court's determinations are not entitled to deference.

## II. JURY'S FINDINGS REGARDING AN IMPLIED IN FACT CONTRACT

The special verdict form presented to the jury in December 2018 contained 10 questions. Following the form's directions, the jury answered eight questions.

Question 1 asked: "Did Plaintiff Robin McCullagh and Defendant Chris Kiosef enter into an implied contract?" The jury answered, "Yes."

Question 2 asked: "Did Plaintiff Robin McCullagh do all, or substantially all, of the significant things that the contract required her to do?" The jury answered, "Yes."

Question 3 asked: "Did Defendant Chris Kiosef do something the contract prohibited him from doing?" The jury answered, "No."

Question 4 asked: "Did Plaintiff Robin McCullagh and Defendant Chris Kiosef enter into an oral agreement for a joint venture?" The jury answered, "No." Based on this answer and the form's directions, the jury skipped to Question 7, the first of three questions addressing McCullagh's quantum meruit cause of action.

Question 7 asked: "Did Defendant Chris Kiosef request, by words or conduct, that Plaintiff Robin McCullagh perform services for the benefit Defendant Chris Kiosef?" The jury answered, "Yes."

Question 8 asked: "Did Plaintiff Robin McCullagh perform the services as requested?" The jury answered, "Yes."

Question 9 asked: "Did Defendant Chris Kiosef pay Plaintiff Robin McCullagh for all the services she provided?" The jury answered, "No."

Question 10 addressed Kiosef's statute of limitations defense by asking: "Did Robin McCullagh permanently leave Chris Kiosef and the bee business before June 27, 2014?" The jury answered, "No." (See Code Civ. Proc., § 339 [two-year limitations period for actions upon a nonwritten contract].)

17.

A.     No Forfeiture

Here, counsel for the parties agreed on the questions in the special verdict form addressing the breach of contract and quantum meruit causes of action.  Also, before the jury was discharged, neither attorney raised the question of whether the special verdict's findings regarding an unbreached implied contract were inconsistent, ambiguous or lacking specificity.  On the issue of forfeiture, we have located nothing in the record suggesting the silence of either attorney was designed to achieve a technical advantage or fulfill a litigious strategy.  (See *Woodcock*, *supra*, 69 Cal.2d at p. 457, fn. 2.)  As a result, we conclude an exception to the general rule of forfeiture applies in this case.  Consequently, neither side forfeited their arguments about the ambiguity of the special verdict or how it should be interpreted.

B.     Interpreting the Special Verdict

Kiosef contends the trial court erred in interpreting the finding in the special verdict that the parties formed an implied contract to mean they entered into an implied partnership agreement.  Kiosef argues that, in light of the pleadings, jury instructions, and arguments of counsel, "the jury, without doubt, determined there was no oral or implied joint venture or general partnership in connection … with respect to King Bee Apiarys, but rather found that the parties entered into an implied 'nonmarital "Marvin" cohabitation' contract."[3]

In considering the parties' conflicting interpretations of the special verdict, we independently assess the meaning of the special verdict's language after considering the

---

[3]     Labeling the implied agreement a *Marvin* cohabitation contract does not resolve the contract's scope.  In *Marvin*, the Supreme Court concluded (1) express or implied contracts between nonmarital cohabitants could be enforced; (2) a great variety of enforceable arrangements are possible; and (3) the conduct of the parties may demonstrate "an implied contract or implied agreement of partnership or joint venture [citation] or some other tacit understanding between the parties." (*Marvin, supra,* 18 Cal.3d at pp. 667, 674, fn. 10, 684.)

18.

pleadings, evidence, instructions, counsel's argument to the jury, and the questions asked by the jury. (See *Fuller*, *supra*, 38 Cal.App.5th at p. 1038.)

McCullagh's complaint included causes of action for breach of oral agreement for joint venture, breach of implied contract, and quantum meruit. The cause of action for breach of implied contract incorporated the allegations about an oral agreement for joint venture and, as a result, can be interpreted to cover a range of possible agreements, including an agreement for a joint venture in the bee business. Thus, in this case, the pleadings do not strongly support either parties' interpretation of the special verdict.

When instructing the jury, the trial court described the issues being presented to them for decision by stating that the parties had agreed to a bifurcated trial, the jury would not be deciding the amount of damages, if any, to award, and:

> "The only issues before you are whether there was an implied contract or an oral contract for a joint venture and if you find there was whether Chris Kiosef breached the contract as well as whether Robin McCullagh is entitled to receive any compensation for the value of her services on her quantum meruit claim."

This instruction is ambiguous because the prepositional phrase "for a joint venture" could modify only "an oral contract" or, alternatively, both "an implied contract or an oral contract." This lack of clarity was addressed later, including the court's statement that "McCullagh claims that she and … Kiosef entered into a contract to become partners in a bee business." This description covers both the oral contract and the implied contract claims. Also, after instructing the jury on the elements of a joint venture, the court stated: "A joint venture can be formed by a written or an oral agreement or by an agreement implied by the parties conduct." Accordingly, the instructions show the jury was told that the implied contract could be an agreement to be partners in the bee business.

Next, we consider how the breach of contract theories were addressed by counsel in their arguments to the jury. Based on the arguments Kiosef has raised on appeal, we

19.

consider whether McCullagh presented the jury with an alternative theory that the scope of implied contract was for something other than being partners in the bee business. Kiosef supports his contention about a narrower *Marvin*-style agreement by referring to McCullagh's counsel arguments about the factors relevant to finding a *Marvin*-style implied contract.[4] After discussing those factors, McCullagh's counsel presented only one theory as to the scope of the implied contract. He stated: "Obviously Mr. Kiosef denies the claims of breach of contract and that will be in some other form on the final instructions, but Ms. McCullagh claims they entered into a contract to become partners in a bee business. So that is kind of the heart of our claim and *it's this implied contract*." (Italics added.)

Our review of McCullagh's counsel's arguments to the jury shows he did not assert the parties formed an implied contract for something other than being partners in the bee business. For instance, he did not mention an implied contract to compensate McCullagh as an employee for her work in the bee business, to compensate for her work in maintaining the household, or both.

Because the theory actually presented to the jury was for an implied contract to become partners in the bee business and not a contract of a lesser scope, we conclude the proper interpretation of the special verdict's finding that the parties formed an implied contract is that the contract was to become partners in the bee business.

---

[4]    The factors included whether the parties (1) lived together, (2) had a significant and stable relationship, (3) had a marriage-like relationship, (4) had separate or joint bank accounts, (6) had separate or jointly held properties, and (7) pooled their finances for the common good of the household. Other factor were (8) the reason the parties did not marry, (9) whether the children took the man's surname, and (10) whether and to what extent the parties contributed to a family business. These factors do not address the scope of the agreement.

C.    Lack of Specificity

Though somewhat redundant to the foregoing analysis, we explain why the cases addressing a special verdict's lack of specificity do not support interpreting the special verdict's findings to mean the implied contract was for something other than becoming partners in the bee business.

In *Fuller, supra,* 38 Cal.App.5th 1034, the plaintiff argued that, for purposes of public entity liability under Government Code section 835, two dangerous conditions were substantial factors in causing the automobile collision that injured him. (*Fuller, supra,* at p. 1039.) In answering the special verdict's questions, the jury found (1) there was a dangerous condition, but (2) the dangerous condition did not create a reasonably foreseeable risk of the kind of injury that occurred. (*Id.* at p. 1038.) The special verdict form did not ask the jury which dangerous condition it found existed. (*Id.* at p. 1039.) Based on the jury's findings, the trial court entered judgment in favor of the public entity. (*Id.* at p. 1036.) The plaintiff appealed, arguing the special verdict findings were fatally inconsistent because the jury did not identify which of the dangerous conditions did not create a reasonably foreseeable risk. (*Id.* at p. 1038.)

The appellate court rejected the inconsistency argument, stating: "Because the special verdict form did not ask the jury to decide the issue with specificity, the jury finding on dangerous condition is tantamount to a general verdict and all reasonable inferences are drawn to support it. [Citation.] 'If any conclusions could be drawn thereunder which would explain the apparent conflict [in the verdict], the jury will be deemed to have drawn them.' " (*Fuller*, *supra*, 38 Cal.App.5th at p. 1039.) The court applied these principles and affirmed the defense judgment. The court concluded substantial evidence supported the jury's finding that, whatever dangerous condition existed, it did not create a reasonably foreseeable risk of the injury suffered by the plaintiff and, therefore, the plaintiff did not prove all essential elements of his claim. (*Ibid.*)

21.

*Fuller* and *Jonkey*, which is discussed in part I.A.4., *ante*, are distinguishable from the present case because two types of dangerous conditions and two types of negligence, respectively, were argued to the jury in those cases. Here, McCullagh's counsel argued just one type of implied contract was formed—namely, an agreement to become partners in the bee business. Consequently, the failure of Question 1 in the special verdict to specify the scope or nature of the parties' implied contract does not require this court to interpret the findings of an implied contract and no breach to mean the implied contract was narrower than an agreement to be partners in the bee business.

This case is similar to *Woodcock*, *supra*, 69 Cal.2d at p. 452, where the special verdict, standing alone, was ambiguous in not specifying whether the $13,000 damage award included an offset for the workers' compensation paid to the plaintiff. (*Id*. at p. 456.) When placed in context, which included the jury instructions given, the court concluded the verdict was not ambiguous because it represented all the plaintiff's damages without offset. (*Id*. at p. 457, fn. 2.) Here, the special verdicts findings of an implied contract that Kiosef had not breached are, when standing alone, unclear as to the scope of the implied contract. As described earlier, the lack of clarity is resolved once the verdict is considered in light of the jury instructions, arguments of counsel, and other surrounding circumstances.

In sum, based on our independent review, we join the trial court in concluding the jury found the parties made an implied contract to be partners in the bee business.

III. THE 2019 COMPLAINT

A. Res Judicata and Collateral Estoppel

Kiosef contends res judicata and collateral estoppel bar McCullagh's prosecution of the partnership claims in her 2019 complaint. We use the term "res judicata" to refer to claim preclusion. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896, fn. 7 (*Mycogen*).) We use the term "collateral estoppel" to refer to issue preclusion. (*Id*. at p.

896; see Heiser, *California's Confusing Collateral Estoppel (Issue Preclusion) Doctrine* (1998) 35 San Diego L.Rev. 509, fn. 1.)

### 1. Res Judicata (Claim Preclusion)

" 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata … prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Mycogen*, *supra*, 28 Cal.4th at p. 896.) "The prerequisite elements of res judicata … are (1) the claim in the present action must be identical to a claim litigated or that could have been litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding." (*Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 185; see *People v. Barragan* (2004) 32 Cal.4th 236, 253.)

Under the doctrine of res judicata, all claims based on the same cause of action must be decided in a single suit. (*Mycogen*, *supra*, 28 Cal.4th at p. 897.) The doctrine precludes piecemeal litigation that would result from splitting a single cause of action or from relitigating the same cause of action on a different legal theory or for different relief. (*Ibid*.) What constitutes a cause of action for purposes of the res judicata doctrine is determined by the primary rights theory. (*Id*. at p. 904.) Under that theory, a cause of action is comprised of a primary right of the plaintiff, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting a breach of that duty. The primary rights theory prevents a plaintiff from dividing a primary right and enforcing it in two suits. (*Ibid*.) "The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action." (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681.) Accordingly, the availability of many forms of relief for the violation of one primary right (i.e., a single cause of

action) should not be confused with the existence of many primary rights—that is, courts must distinguish between the primary right and the remedies.

### 2. Collateral Estoppel (Issue Preclusion)

The threshold requirements of the doctrine of collateral estoppel are: "First, the issue sought to be precluded relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Fi[fth], the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.) If all the threshold requirements are satisfied, courts then "look[] to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting. (*Id*. at p. 342–343.) Those public policies include "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." (*Id*. at p. 343.)

### 3. Phase One and the Final Judgment Requirement

McCullagh contends the doctrines of res judicata and collateral estoppel do not apply to the results of the first phase of the bifurcated trial because there was no "final judgment on the merits." (*People v. Barragan, supra,* 32 Cal.4th at p. 253.) With respect to the existence of a judgment, Kiosef has argued he "was entitled to a judgment in his favor under the 'implied contract' second cause of action in the 2016 complaint" based on the jury's express findings that he did not breach the terms of the implied contract, regardless of its scope. If Kiosef were correct about his entitlement to judgment, his arguments about res judicata and collateral estoppel based on that judgment still fall short. While this appeal is pending, that judgment could not be final and, therefore, it

24.

could not satisfy the final judgment requirement of the doctrines of res judicata or collateral estoppel.

Consequently, we agree with the point raised in McCullagh's respondent's brief and conclude the final judgment requirement of the doctrines has not been satisfied. We note that Kiosef's reply brief did not address this point and, thus, does not present arguments or authority supporting the conclusion that the final judgment requirement had been met. In addition, his reply brief made no reference to the primary rights theory or a plea in abatement. Consequently, he did not argue his res judicata and collateral estoppel arguments should be interpreted as asserting the primary rights theory as a bar to any further attempts by McCullagh at enforcing the partnership agreement in this litigation.[5]

B.     Claim for an Accounting and Division of Profits Was Not Moot

Kiosef contends the accounting remedy in McCullagh's 2019 complaint was tethered to that pleading's other causes of action and, as a result, was rendered moot by McCullagh's dismissal with prejudice of those other claims. We disagree. Kiosef's contention misinterprets the 2019 complaint.

1.     *Contents of 2019 Complaint*

McCullagh's 2019 complaint contained four causes of action labeled (1) partnership dissolution, (2) accounting, (3) declaratory relief, and (4) appointment of receiver or injunctive relief. The "accounting" cause of action contains three paragraphs. The first incorporates by reference the six paragraphs of the partnership dissolution cause of action. The second alleges Kiosef took exclusive control and possession of the partnership books and accounts; Kiosef refused and continued to refuse to account to

---

[5]     One means of enforcing the primary rights theory is setting up the final "judgment as a bar under the principles of res judicata." (*Crowley v. Katleman*, *supra*, 8 Cal.4th at p. 682.) The second means is a plea in abatement "if the first suit is still pending when the second is filed." (*Ibid*.; see Code Civ. Proc., § 430.10, subd. (c); 5 Witkin, Cal. Procedure (6th ed. 2024) Pleading, § 970 [other action pending].)

McCullagh concerning the allocation of partnership profits; and McCullagh made a written demand that Kiosef account and distribute partnership profits to her in compliance with the fiduciary responsibilities of a partner. The third paragraph states that McCullagh "seeks an order directing [Kiosef] to create a full accounting of all the profits and losses of the partnership since its inception in 2002."

The 2019 complaint's prayer for relief contains six numbered paragraphs. The first four are correlated to the four causes of action. The paragraph related to the "accounting" cause of action states in full: "2. That an account be taken of all the dealings and transactions of the partnership from its commencement, and all the money received by and paid to [McCullagh] and [Kiosef] respectively, in relation to the partnership and that [McCullagh] have judgment against [Kiosef] for any and all sums that may be found owing to [McCullagh]." Accordingly, when the cause of action and its prayer for relief are read together, it is clear that the wrongful conduct alleged is that, after a written demand for an accounting and distribution of partnership profits, Kiosef failed to comply, which violated his fiduciary duty as a partner.

As a result, we conclude that despite McCullagh's use of the one word "accounting" label for the cause of action, that remedy was not untethered from allegations of wrongful conduct and the cause of action did not request only an accounting. The relief sought included payment of McCullagh's share of the profits. Therefore, Kiosef's interpretation of that cause of action as seeking only the equitable remedy of an accounting is not accurate and his argument that the dismissal of the claims for partnership dissolution, declaratory relief, and appointment of a receiver rendered the second cause of action moot fails.

### 2. Finding of 50 Percent Ownership

Kiosef refers to the trial court's determination that the implied contract was that of a general partnership in which each partner owned a 50 percent interest. The trial court's

26.

September 2020 ruling interpreted the jury's verdict to mean "[t]he jury found that the parties entered into an implied partnership contract to jointly own the business" and "that partnership is a general partnership pursuant to section 16401(b) of the California Corporations Code." The court also determined there was "no … finding that the partnership has terminated" notwithstanding the parties' permanent separation and, therefore, the partnership still existed.

We conclude the trial court's determinations do not constitute legal error. First, as described earlier, the court properly interpreted the jury's finding about the existence of an implied partnership agreement. Second, the determination that each party held a 50 percent share was compelled by statute.

"The [California Revised Uniform Partnership Act], adopted in 1996, applies to all partnerships as of 1999. ([Corp. Code,] § 16111, subd. (b).)." (*Corrales v. Corrales* (2011) 198 Cal.App.4th 221, 226.) The terms of a partnership are controlled by the partnership agreement, or by the California Revised Uniform Partnership Act (UPA) if the agreement is silent on an issue. Corporations Code section 16103, subdivision (a) provides that "relations among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership." In other words, once a partnership is established, the conduct of the parties and the provisions of the California Revised Uniform Partnership Act supply the details of the agreement. (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 457.) One such detail is provided by Corporations Code section 16401, subdivision (b): "Each partner is entitled to an equal share of partnership profit[.]"

We conclude the trial court properly applied the foregoing provisions when it determined the partnership was a general partnership in which each part held a 50 percent interest.

### 3. *Partnership as the Basis for an Accounting*

Kiosef contends McCullagh had not proven a relationship that warrants an accounting. He argues an accounting is not a stand-alone claim and, rather, is derivative to some other cause of action. (See *Herrejon v. Ocwen Loan Servicing, LLC* (E.D.Cal. 2013) 980 F.Supp.2d 1186, 1208 [right to an accounting is derivative; it must be based on other claims].)

"Generally, an underlying fiduciary relationship, such as a partnership, will support an accounting, but the action does not lie merely because the books and records are complex. [Citations.] Some underlying misconduct on the part of the defendant must be shown to invoke the right to this equitable remedy." (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1137.) Under these principles, McCullagh established both the existence of a partnership and underlying misconduct—namely, the failure to pay profits after a written demand. Therefore, we reject Kiosef's contentions that she had not proven a relationship that warranted an accounting or had sued him for "wrongful conduct where an accounting remedy would attach."

### DISPOSITION

The June 1, 2023 final judgment is affirmed. McCullagh shall recover her costs on appeal.

FRANSON, J.

WE CONCUR:

LEVY, Acting P. J.

SNAUFFER, J.

28.